IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ---------------------------------------------------- x | | Chapter 11 |
| | : | |
| In re: | : | Case No. 09-10384 (CSS) |
| | : | |
| FLUID ROUTING SOLUTIONS | : | Jointly Administered |
| INTERMEDIATE HOLDING CORP., | : | |
| a Delaware Corporation, et al., | : | |
| | : | **Bid Procedures Hearing Date: February 17, 2009 at 1:00 p.m.** |
| | : | **Bid Procedures Objection Deadline: February 16, 2009 at 12:00 p.m.** |
| Debtors.[1] | : | **Sale Hearing Date (Proposed): March 12, 2009 at TBD** |
| ---------------------------------------------------- x | | **Sale Objection Deadline (Proposed): March 9, 2009 at 4:00 p.m.** |

**DEBTORS' MOTION FOR ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS RELATING TO THE FLUID ROUTING SOLUTIONS BUSINESS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; AND (V) GRANTING RELATED RELIEF; AND (B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move this Court pursuant to sections 105(a), 363, and 365 of title 11 of the United States

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of two orders: (a)

one, substantially in the form annexed hereto as Exhibit A (the "Bid Procedures Order"), (i)

approving the procedures (the "Bid Procedures") substantially in the form annexed hereto as

Exhibit B, including the Expenses Reimbursement as set forth below and in the asset purchase

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Fluid Routing Solutions Intermediate Holding Corp. (1438), Fluid Routing Solutions, Inc. (1567); Fluid Routing Solutions Automotive, LLC (f/k/a Mark IV Automotive, LLC) (6301), and Detroit Fuel, Inc. (4910). The address for each of the Debtors is 1955 Enterprise Drive, Rochester Hills, MI 48309

agreement (the "Agreement") between the Debtors and FRS Holding Corp. (the "Stalking Horse Purchaser"), with respect to the proposed sale (the "Sale") of substantially all of the assets of the Debtors' hose extrusion, fuel assembly and power steering service business (as discussed in greater detail below, the "Acquired Assets"), (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "Auction"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors (the "Assumed and Assigned Agreements"); and (v) granting related relief; and (b) the second order, substantially in the form annexed hereto as Exhibit C (the "Sale Order"), (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, a copy of which is attached hereto as Exhibit D, (ii) authorizing and approving the Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Contracts, and (iv) granting related relief. In support of this motion (the "Motion"), the Debtors rely upon the Declaration of John Carson (the "Declaration)" in Support of First Day Motions, and respectively represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, along with Bankruptcy Rules 2002, 6004, 6006, and 9014.

DB02:7786587.3

068067.1001

*A. Introduction*

2. On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these cases.

*B. The Debtors*

4. FRS Inc. was formed on May 25, 2007, when an affiliate of Sun Capital Partners, Inc. ("<u>Sun Capital</u>"), a leading private investment firm, acquired the assets and liabilities of a division of Dayco, a Mark IV Industries, Inc. company. FRS Inc. is a wholly owned subsidiary of Fluid Routing Solutions Intermediate Holding Corp ("<u>FRS Intermediate</u>"). FRS Intermediate is a wholly owned subsidiary of Fluid Routing Solutions Holding Corp. ("<u>FRS Holding</u>"). FRS Holding is a wholly-owned subsidiary of Fluid Routing Solutions Group, LLC ("<u>FRS Group</u>"), which is the ultimate parent of the FRS group of companies. Neither FRS Holding nor FRS Group is a debtor in these cases.

5. FRS Inc. is the 100% owner of FRS Automotive, which, in turn, is the 100% owner of Detroit Fuel. FRS Inc. is also the 100% owner of Fluid Routing Solutions Canada Corp. ("<u>FRS Canada</u>"), a Nova Scotia entity. FRS Canada is not involved in these chapter 11 cases or in any analogous proceeding.

*C. The Debtors' Business*

6. The Debtors are leading designers and manufacturers of innovative, highly-engineered fuel management systems, fluid handling systems and hose extrusion products for major original equipment manufacturers (each, an "<u>OEM</u>") in the automotive industry. Fuel

3

management systems products include fuel filler assemblies and coolant hoses. Fluid handling systems products include power steering hose and hose assemblies and transmission oil cooler assemblies. Hose extrusion products include several forms of manufactured hose including bulk hose, formed hose and radiator hose. The Debtors sell to automotive manufacturers in North America and sell a small amount of their product internationally, including (i) formed hose to Brazil and (ii) fuel systems to Daewoo in Korea and Saab in Sweden, as well as other products to Spain and Portugal. Their primary end customers include General Motors, Chrysler, Ford and Toyota.

7.      The Debtors manufacture their products in dedicated manufacturing facilities located in Lexington, Tennessee; Big Rapids, Michigan; Ocala, Florida; and Easley, South Carolina. The Debtors also own a Detroit facility, which was closed in 2008. The Tennessee, Florida and South Carolina facilities are owned by FRS Inc., the Big Rapids, Michigan facility is owned by FRS Automotive and the Detroit, Michigan facility is owned by Detroit Fuel. Each facility is subject to a mortgage in favor of Wells Fargo Foothill, Inc. (as administrative agent, collateral agent and secured lender, "WFF"), as collateral securing the Credit Facility (as described below).   The Debtors lease their corporate headquarters located in Rochester Hills, Michigan.

8.      For the twelve month period ending December 31, 2008, the Debtors had approximately $211,546,000 million in sales. As of the Petition Date, the Debtors currently employ approximately 1039 active employees (the "Employees"), of whom approximately 845 are hourly Employees, and 194 are salaried Employees. Of the Debtors' 845 hourly Employees, 350 are the subject of a collective bargaining agreement.

4

*D.    Existing Debt*

9.    The Debtors are borrowers and/or guarantors under two different secured credit facilities and, as of the Petition Date, have total outstanding secured debt in the approximate principal sum of $4,225,371.00 million plus accrued interest thereon.

10.    FRS Inc., FRS Automotive and Detroit Fuel (collectively, the "Borrowers"), are parties to a senior secured credit facility with WFF, dated as of July 30, 2007 (as amended, supplemented or modified, the "Credit Facility"). The Credit Facility consists of a revolving credit facility, including a sub-facility for letters of credit. As of the Petition Date, there was approximately $225,371.00 outstanding in revolving credit loans (plus accrued but unpaid interest) and approximately $3.2 million in issued but undrawn letters of credit. In addition, pursuant to Section 5 of that certain Fee Letter dated July 30, 2007 (the "Fee Letter"), and separate and apart from the Credit Facility obligations, the Borrowers are liable for payment to WFF for a prepayment premium in the amount of $250,000 (the "Prepayment Premium").[4] The Borrowers are jointly and severally obligated under the Credit Agreement. Additionally, FRS Intermediate is a guarantor of the obligations under the Credit Facility.

11.    As collateral security for all of the obligations under the Credit Facility, WFF was granted a first priority lien on substantially all of the Borrowers' assets. In addition, FRS Intermediate pledged substantially all of its assets to WFF to secure its obligations arising under the guarantee of the obligations under the Credit Facility.

12.    The Borrowers are also makers of that certain Senior Subordinated Secured Promissory Note, dated June 16, 2008, issued to Sun Fluid Routing Finance, LLC ("Sun FR Finance"), in a principal amount of up to $10 million (the "Sun FR Finance Note"), which is also

---

[4]  Pursuant to Section 5 of the Fee Letter, the actual amount of the Prepayment Premium was $500,000, but has been reduced to $250,000 by the agreement of WFF and the Borrowers.

guaranteed by FRS Intermediate. Sun FR Finance is an affiliate of Sun Capital and is the Debtors' intended post-petition lender.

13.    As collateral security for all of the obligations under the Senior Subordinated Notes, Sun FR Finance holds a second priority lien on substantially all of the Debtors' assets.

14.    The Debtors, WFF and Sun FR Finance are parties to a Subordination and Intercreditor Agreement, dated as of June 16, 2008 (as amended, supplemented or modified from time to time, the "Intercreditor Agreement"), which sets forth the respective rights and obligations of the Debtors' secured lenders, including among other things, the priority of payment to such lenders.

*E.    Events Leading To The Chapter 11 Filing*

15.    A variety of external factors have led to a decline in the Debtors' operating performance. These factors include a dramatic downturn in the global economy, unprecedented volatility in the global credit markets and a steep decline in domestic and foreign auto sales. The Debtors are almost completely dependent on the domestic auto industry. The North American automotive industry is facing strong headwinds such as: significant volume decreases, the move from trucks and SUVs to small cars, increases in raw material prices, supplier/customer friction, weak credit markets, a considerable drop in consumer confidence, and financial stress for the "Big Three." The automotive parts market in which the Debtors compete is directly correlated to the automotive industry as a whole. In 2007, approximately 15.1 million cars and light trucks were produced in North America. Forecasts for 2008 reflected North American light vehicle production at slightly below 12.6 million and reflect a further decline for 2009 at approximately 10.4 million.

16.     These declining OEM production volumes and significant changes in vehicle segment mix in the U.S. have reduced the Debtors' revenues during a period of rapidly increasing materials costs. This combination of increasing material costs, quickly deteriorating revenue, and weak credit markets precipitated the filing by the Debtors of their chapter 11 petitions.

17.     In response to rapidly evolving automotive industry conditions, the Debtors aggressively reduced costs and restructured their operations in an effort to better align their manufacturing capacity, lower operating costs and streamline their organizational structure. Since being acquired in 2007, the Debtors' management team has engaged in an extensive restructuring effort to rationalize operations and increase profitability. The primary initiative of the restructuring was to reduce the number of facilities from six to four. The Debtors closed the Quebec facility in February 2008 and transferred the business to their Easley, SC facility. The Detroit, MI facility was closed and all operations were transferred to the Debtors' Big Rapids, MI facility. In addition, the Debtors consolidated the formed hose operations by transferring the contracts in Ocala, FL to the Lexington, TN facility.

18.     Even with the success in reducing the fixed costs of the Company, the Debtors have not been able to generate sufficient cash flows to meet their continuing obligations. In light of continued global economic instability, including the unique financial difficulties currently faced by the "Big Three" United States automakers, the Boards of Directors, in the exercise of their reasonable business judgment (and after extensive negotiations with their lenders, customers and the creditor constituencies described above, a review of various liquidation and sale recovery scenarios, and discussions with the Debtors' professionals), ultimately determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their

7

creditors is to seek protection under the Bankruptcy Code in order (i) to sell their viable fuel-related business in an auction conducted under the supervision of the Bankruptcy Court and (ii) to complete a prompt and orderly liquidation of substantially all of their remaining U.S.-based assets.[2] The Debtors believe that proceeding under chapter 11 will maximize the value of such assets and will reduce potential risks, contingencies and uncertainties in the proposed wind-down.

## THE PROPOSED SALE

19.    Pursuant to the Agreement, the Debtors propose to sell the Acquired Assets to the Stalking Horse Purchaser free and clear of liens, claims, and encumbrances, with such liens, claims, and encumbrances to attach to the Sale proceeds. The Stalking Horse Purchaser is a newly formed entity called FRS Holding Corp. which is indirectly owned by the ultimate parent company which owns the Debtors.

20.    The Sale of the Acquired Assets represents the culmination of an extensive negotiation process conducted by the Debtors and their advisors, including the Debtors' independent Chief Restructuring Officer)[3] on the one hand, and the Stalking Horse Purchaser and its counsel and advisors on the other hand. The Debtors and the Stalking Horse Purchaser entered into the Agreement on the petition date.

21.    The following paragraphs in this section summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement.[4]

    a.    Acquired Assets. All assets and contracts related to the Business as defined in the Agreement.

---

[2] FRS Holding Corp., a Sun Capital affiliate, is the intended "stalking horse" bidder for the fuel assets.

[3] The financial advisory firm of Mesirow Financial Interim Management, LLC ("Mesirow") was retained by the Debtors prior to the petition date to serve as independent Chief Restructuring Officer ("CRO").

[4] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Agreement attached hereto as Exhibit C.

DB02:7786587.3                                                                                    068067.1001

b. <u>Purchase Price</u>. $11 million, subject to adjustments described in the Agreement, plus the assumption of significant Assumed Obligations.

c. <u>Deposit</u>. In lieu of a deposit, the Stalking Horse Purchaser or its affiliate is providing DIP financing to ensure the continued operations of the Debtors.

d. <u>Due Diligence</u>. To be completed prior to the Bid Procedures hearing.

e. <u>Closing and Other Deadlines</u>. Conditional, upon satisfaction of conditions precedent set forth in the Agreement.

22. The Sale of Acquired Assets will not include any of the Debtors' avoidance actions under chapter 5 of the Bankruptcy Code, and the Debtors will have reasonable access to their books and records subsequent to the Sale so as to enable them to administer these bankruptcy cases.

## **RELIEF REQUESTED**

23. By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Bid Procedures Order (i) approving the Bid Procedures, including the Expense Reimbursement (as defined below), with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, (iv) establishing procedures to determine cure amounts and deadlines for objections for the Assumed and Assigned Agreements, and (v) granting related relief; and (b) the Sale Order (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement, (ii) authorizing and approving the Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (iv) granting related relief.

## **PROPOSED BID PROCEDURES**

24. The Debtors desire to receive the greatest value for the Acquired Assets. Although the Debtors and their professionals and the CRO have undertaken efforts to market the

Acquired Assets,[5] in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any declination in value, the Debtors believe that it is imperative that they promptly move forward in the hope that higher and better offers are generated for the Acquired Assets. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting further active bidding that will result in the highest or best offer the marketplace can sustain for the Acquired Assets while affording appropriate protection to the Stalking Horse Purchaser. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close a transaction.

A.     Bid Procedures

25.     Attached to this Motion are the proposed Bid Procedures.[6] Pursuant to Local Rule of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware 6004-1: (i) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (ii) the Auction will be conducted openly and all creditors will be permitted to attend provided that advance written notice is given to the Notice Parties; and (iii) bidding at the Auction will be transcribed or videotaped. The Bid Procedures are typical for asset sales of this size and nature, include provisions for consultation with the Committee and require a deposit and that a bidder be a "Qualified Bidder" as defined in the Bid Procedures.

---

[5] The Debtors have also created an extensive data room for potential purchasers to quickly and efficiently perform due diligence and a form confidentiality agreement is available.

[6] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Bid Procedures attached hereto as Exhibit A, or the Agreement, as applicable.

26.     The following paragraphs in this section summarize key provisions of the

Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures.

    a.     <u>Participation Requirements</u>.

        i.     <u>Confidentiality Agreement</u>.  An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a "<u>Confidentiality Agreement</u>"); and

        ii.     <u>Proof of Financial Ability to Perform</u>.  The most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion.

    b.     <u>Qualified Bid</u>.

        i.     <u>Modified Agreement</u>.  A Bid shall include a black-lined copy of the Agreement (the "<u>Modified Agreement</u>") to show all changes requested by the Bidder, including those related to the Purchase Price; <u>provided</u>, <u>however</u>, that the terms of the Modified Agreement are substantially the same or better than the terms of the Agreement.

        ii.     <u>Acquired Assets</u>.  Each Bid shall be for all of the Acquired Assets; provided, however, that the Debtors may consider a combination of multiple Bids, each of which is for less than all of the Acquired Assets, so long as (i) such combination of Bids collectively offers an aggregate amount equal to the Minimum Initial Bid (defined below), and (ii) each Bid comprising such combination otherwise meets the requirements of a Qualified Bid (such combination of Bids, a "<u>Combination Bid</u>").

        iii.     <u>Contingencies</u>.  A Bid may not be conditioned on obtaining internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

        iv.     <u>Authorization to Bid</u>.  A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors (or

DB02:7786587.3

068067.1001

comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

    v.    <u>Good Faith Deposit</u>. Each Bid or Combination Bid must be accompanied by a cash deposit in an amount equal to $1,000,000 (the "<u>Good Faith Deposit</u>").

    vi.    <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid or Combination Bid shall have an initial minimum bid requirement equal to the sum of (i) the Purchase Price, (ii) the Expense Reimbursement, and (iii) $250,000 (the "<u>Minimum Initial Bid</u>").

    vii.    <u>Other Evidence</u>. Each Bid or Combination Bid must contain evidence satisfactory to the Debtors that the bidder is reasonably likely (based on availability of financing, experience and other considerations) to be able to timely consummate a purchase of the Acquired Assets if selected as the Successful Bidder (as defined below).

c.    <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be March 9, 2009, at 12:00 p.m. (Eastern Time) (the "<u>Bid Deadline</u>"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).

d.    <u>Auction</u>. In the event that the Debtors receive at least one (1) Qualified Bid (other than the Stalking Horse Purchaser) by the Bid Deadline, the Debtors shall conduct an auction (the "<u>Auction</u>") of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than March 10, 2009 at 4:00 p.m. (prevailing Eastern time), the Debtors will notify all Qualified Bidders of (i) the highest or otherwise best Qualified Bid, (the "<u>Baseline Bid</u>") and (ii) the time and place of the Auction. The Auction shall commence at 9:00 a.m. (prevailing Eastern time) on March 11, 2009 at the offices of Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178.

e.    <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before March 12, 2009.

27.    The Debtors, with the reasonable consent of the DIP Lender, expressly reserve the right to modify the relief requested herein. Moreover, the Debtors, with the reasonable consent of the DIP Lender, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders, (b) impose additional terms

and conditions with respect to any or all potential bidders, (c) extend the deadlines set forth herein, (d) cancel the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

*B.     Expense Reimbursement*

28.     The Agreement submitted by the Stalking Horse Purchaser contemplates bid protections in the form of an Expense Reimbursement. The Debtors seek to provide such expense reimbursement in recognition of the Stalking Horse Purchaser's substantial expenditure of time, energy, and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or guaranteed minimum bid. The Expense Reimbursement is required by the Agreement. There is no break-up fee being sought herein.

29.     By this Motion, the Debtors seek authority to be able to award and, if required pursuant to the terms of the Agreement, to reimburse the Stalking Horse Purchaser for reasonable and necessary expenses incurred in connection with the formation, negotiation and documentation of the Agreement (including counsel and financial advisory fees related thereto), and in participation in the Sale process, up to a cap of $1,250,000 (the "Expense Reimbursement"). If approved, the Expense Reimbursement will be paid to the Stalking Horse Purchaser pursuant to the terms of the Agreement.

*C.     Notice of Auction*

30.     The Debtors seek to have the Auction scheduled for a date no later than March 11, 2009 as mandated by the Agreement. Simply put, the value of the Acquired Assets will decline substantially if the Sale process is not completed on an expedited basis, as key customers and vendors will terminate their relationships with the Debtors. In addition, the Debtors do not

13

have the funds to operate the business beyond the timeline set forth in the Agreement. Indeed, the Stalking Horse Purchaser is funding the Debtors' operations at this time because no DIP financing was available from any other source.[7]

31.     Not later than one business day after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as Exhibit E (the "Sale Notice"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Debtors pre- and post-petition lenders, (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (f) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (g) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; and (h) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

32.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 4:00 p.m. (ET) on March 9, 2009; and (d) be served so as to be received by such date and time on: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Debtors' pre and post-petition lenders; (iv)

---

[7] If the Stalking Horse Purchaser is the winning bidder, it will credit bid its DIP loan towards the purchase price. This DIP loan to fund operations is a substantial benefit to the Debtors and far more valuable than any customary 10% "deposit" from a bidder that would have been held in an escrow.

the Office of the United States Trustee; (v) counsel to the Stalking Horse Purchaser; and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1(b).

33.     Not later than three (3) business days after entry of the Bid Procedures Order, the Debtors will publish the Sale Notice in the national edition of *The Wall Street Journal*. Debtors will also place notice of the bid procedures and sale on their website.

D.     *Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Assumed and Assigned Agreements*

34.     To facilitate and effect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements to the Stalking Horse Purchaser, or as applicable, to the Successful Bidder.

35.     Given the large number of executory contracts and unexpired leases to which the Debtors are a party, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "Cure Amounts"), and (b) the deadline for objections to the assumption and/or assignment of contracts and leases to be assumed and/or assigned in connection with the Sale (collectively, the "Cure Procedures").

36.     The Stalking Horse Purchaser shall be assigned the Assumed and Assigned Agreements set forth on Schedule 2.1(a)(iv) to the Agreement. Schedule 4.15 to the Agreement provides the proposed Cure Amounts in connection with the assumption of the Assumed and Assigned Agreements. Schedules 2.1(a)(iv) and 4.15 to the Agreement will be filed with the Court shortly.

37.     The Debtors shall prepare and distribute to non-Debtor parties to the Assumed and Assigned Agreements a notice, substantially in the form annexed hereto as Exhibit F (a "Cure Notice"), listing (i) the Assumed and Assigned Agreement(s), and (ii) the Cure

Amount(s), if any. If the Stalking Horse Purchaser is not the Successful Bidder at the Auction, no later than two (2) business days after the Auction, the Debtors shall send a subsequent Cure Notice, to all non-Debtor parties to executory contracts or unexpired leases to be assigned to the Successful Bidder that were not Assumed and Assigned Agreements.

38. To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed and Assigned Agreements, the Debtors propose the following deadlines and procedures:

a. The non-Debtor parties to the Assumed and Assigned Agreements shall have until March 9, 2009 (the "Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object (a "Contract Objection") to (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts, and/or (ii) the proposed assumption and/or assignment of the Assumed and Assigned Agreements in connection with the Sale; provided, however, if the Stalking Horse Purchaser is not the Successful Bidder at the Auction, and the Debtors send a Cure Notice to a non-Debtor party to an Assumed and Assigned Agreement, or if the Debtors otherwise amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have until the commencement of the Sale Hearing to submit a Contract Objection (the "Amended Contract Objection Deadline").

b. Any party objecting to the Cure Amounts or objecting to the potential assumption and/or assignment of such Assumed and Assigned Agreement(s), shall be required to file and serve a Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assumed and Assigned Agreements(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Contract Objection is received no later than 4:00 p.m. on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. Where a nondebtor counterparty to an Assumed and Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (a) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse Purchaser (or the Successful Bidder) of such consensual resolution, the Debtors shall promptly provide any statutory committee appointed in these chapter 11 cases (the "Committee") and the Stalking Horse Purchaser

16

(or the Successful Bidder) notice and opportunity to object to such proposed resolution or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter.

39.     Unless an objection to the assumption and assignment of an Assumed and Assigned Agreement is filed and served before the Contract Objection Deadline, all counterparties to the Assumed and Assigned Agreements shall (i) be forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Assumed and Assigned Agreements, and the Debtors and Stalking Horse Purchaser (or the Successful Bidder) shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (ii) be deemed to have consented to the assumption and assignment, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or Stalking Horse Purchaser (or the Successful Bidder) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assumed and Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assumed and Assigned Agreements.

## BASIS FOR RELIEF REQUESTED

*A.     The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved*

40.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

41.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

42.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section

105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

43.    The Debtors submit that more than ample business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures. The Debtors believe that a targeted sale process is most likely to achieve the highest and best price for the Acquired Assets. Simply stated, since the Debtors do not have sufficient cash resources to continue to operate the business, the Acquired Assets will continue to decline in value absent a prompt sale. Moreover, the entire auto industry is in a crisis, prices of all assets are dropping, and there is virtually no available financing for prospective buyers of auto assets  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

DB02:7786587.3    068067.1001

44.     The Notice of Auction and the Sale is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Indeed, the Debtors and their professionals have and will continue to market the Acquired Assets, and have solicited the most likely interested competing bidders.  Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

45.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets.  The process proposed by the Debtors allows for a timely and efficient auction process, given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and to perform diligence.  The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets.  The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures.  Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and, therefore, the third prong of the *Abbotts Dairies* standard is satisfied.  As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

B.     *The Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code*

46.     The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

47.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

48.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

49.     The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an intensely negotiated and at arm's-length transaction, in which the Stalking Horse Purchaser, although an affiliate of an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, acted in good faith. For example, Debtors had separate legal counsel and had an independent CRO negotiate the transaction. Accordingly, the Debtors request that the Court make the finding that the Stalking Horse Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

C.     *The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code*

50.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or

DB02:7786587.3                                                                                                         068067.1001

interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

D.     *The Expense Reimbursement is Reasonable and Appropriate*

51.     Approval of the Expense Reimbursement is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) ("In re O'Brien"). In *In re O'Brien*, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien*, 181 F.3d at 535. Here, the Expense Reimbursement should be approved because it will provide a benefit to the Debtors' estates.

52.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be

necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second:

> if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.

*Id.*

53. In *In re O'Brien*, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien*, 181 F.3d at 536.

54. After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. *See In re Chi-Chi's Inc.*, Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Riverstone Networks*, Case No. 06-10110

068067.1001

(Bankr. D. Del. February 24, 2006) (fee of 3% permitted); *In re Radnor Holdings*, Case No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *Tama Beef Packing, Inc.*, 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); *In re Great Northern Paper, Inc.*, Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *Integrated Resources*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%).

55.     Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the Expense Reimbursement should be approved because it is necessary to obtain the maximum return for the benefit of the Debtors' estates.  Initially, all negotiations between the Debtors and the Stalking Horse Purchaser have been conducted on a good faith, arm's-length basis.  The Debtors' ability to continue to shop the Acquired Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser—a "bird-in-the-hand"—would be eliminated if the Debtors are not authorized to remit the Expense Reimbursement.  Therefore, absent authorization of the payment of the Expense Reimbursement, the Debtors might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Agreement.

56.     The Agreement and the Stalking Horse Purchaser's monetary offer will form the basis upon which other bids will be submitted and evaluated.  The establishment of the Expense Reimbursement permits the Debtors to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates.  Thus, even if the Stalking Horse Purchaser is offered the Expense

Reimbursement and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by the improved bid and thereby increase the likelihood that the price at which the Acquired Assets will be sold will reflect their true worth.

57.     Not only is the Expense Reimbursement necessary, it is reasonable.  Paying an Expense Reimbursement of $1.25 million of the total value of the consideration being given is reasonable since the Stalking Horse's bid includes, among other things, an $11 million purchase price, a multi-million emergency DIP loan, assumption of nearly millions of dollars in liabilities of the Debtor, a waiver of millions of dollars in secured claims and payment of cure amounts.  In light of the benefit to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Expense Reimbursement.

58.     The Debtors' payment of the Expense Reimbursement under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) of substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Purchaser.

59.     The Debtors have demonstrated a sound business justification for authorizing the Expense Reimbursement and its clear necessity and benefit to these estates.  Thus, the Debtors request that this Court approve and authorize payment of the Expense Reimbursement.

E.      *The Cure Procedures Provide Adequate Notice and Opportunity*
        *to Object and Should be Approved*

60.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract

or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

61.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

26

62.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

63.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary

pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

64.    The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Agreements with adequate notice in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that implementation of the proposed Cure Procedures is appropriate in these cases.

F.    *Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) is Appropriate*

65.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) is waived.

66.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10)

day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

67.     As described above, time is clearly of the essence, since the Debtors are on the verge of losing key customers and vendors, have insufficient cash to operate the business on a prolonged basis, and the "perfect storm" of financial and automotive crisis and the uncertainty of the viability of the "Big 3" automakers, is resulting in a decline on the value of the assets. Since the closing of the Sale promptly is of critical importance, the Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h).

## NOTICE

68.     Notice of this Motion has been provided to (i) the Office of the United States Trustee; (ii) the parties included on the Debtors' list of thirty (30) creditors holding the largest unsecured claims on a consolidated basis; (iii) counsel for the Debtors' prepetition and post-petition lenders; and (iv) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. LR 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request: (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as Exhibit A; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as Exhibit C; and (iv) such other and further relief as the Court deems just and proper.

Dated: February 6, 2009
      Wilmington, Delaware

          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

          Michael R. Nestor (No. 3526)
          Kenneth J. Enos (No. 4544)
          The Brandywine Building
          1000 West Street, 17th Floor
          P.O. Box 391
          Wilmington, DE19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253

          and

          MORGAN LEWIS & BOCKIUS, LLP
          Neil E. Herman
          Kizzy L. Rosenblatt
          101 Park Avenue
          New York, New York  10178-0060
          Telephone: (212) 309-6000
          Facsimile: (212) 309-6001

          Proposed Counsel for Debtors and Debtors-in-Possession