# Exhibit 2

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Settlement Agreement") is made and entered into as of March 23, 2009, by and among (1) Fluid Routing Solutions Intermediate Holding Corp ("FRS Intermediate"), Fluid Routing Solutions, Inc. ("FRS Inc."), Fluid Routing Solutions Automotive, LLC (f/k/a Mark IV Automotive, LLC)("FRS Automotive") and Detroit Fuel, Inc. ("Detroit Fuel" and, collectively with FRS Intermediate, FRS Inc. and FRS Automotive (the "Debtors"), debtors and debtors-in-possession in chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 09-10384 (CSS) (Jointly Administered), (2) Mark IV Industries, Inc., a Delaware corporation ("Mark IV"), and Dayco Products, LLC, a Delaware limited liability company ("Dayco" and, together with Mark IV, the "Mark IV Entities"), parties to various agreements with certain of the Debtors as set forth herein, and (3) FRS Holding Corp., a Delaware corporation ("FRS Holding"), the proposed purchaser of certain of the Debtors' assets and business operations as set forth herein.

### RECITALS

#### A.     Agreements Between FRS Inc. and the Mark IV Entities

**WHEREAS**, FRS Inc. and its affiliate Fluid Routing Solutions Canada Corp. ("FRS Canada") and Mark IV, Dayco and their affiliate Dayco Fluid Technologies Corp. ("DFTC") are parties to that certain Purchase Agreement, dated May 25, 2007 (the "2007 Purchase Agreement"), pursuant to which Mark IV sold all of the capital stock of FRS Automotive to FRS Inc. and Dayco and DFTC sold certain of their assets to FRS Inc. and FRS Canada.

1

WHEREAS, pursuant to, and in accordance and connection with, the 2007 Purchase Agreement, FRS Inc. and the Mark IV Entities entered into various interrelated agreements, including among others, (1) a Supply Agreement, dated as of May 25, 2007, between FRS Inc. and the Mark IV Entities (the "Supply Agreement"), (2) an Information Technology Transition Services Agreement, dated as of May 25, 2007, between FRS Inc. and the Mark IV Entities (the "IT TSA"), (3) an Assignment and Assumption of Lease, dated May 25, 2007, between Dayco FRS Inc. (the "Lease Assignment"); (4) a Sublease Agreement, dated as of May 25, 2007, between FRS Inc. and Dayco (the "Sublease"); and (5) an Escrow Agreement, dated as of May 25, 2007 (the "Escrow Agreement"), among FRS Inc., the Mark IV Entities and Wells Fargo Bank, N.A. ("Wells Fargo"). The other agreements FRS Inc. and the Mark IV Entities entered into pursuant to the 2007 Purchase Agreement are set forth on Exhibit A attached hereto and, as used herein, shall have the same meanings as defined on Exhibit A.

WHEREAS, each of the 2007 Purchase Agreement, the IT TSA, the Supply Agreement, the Escrow Agreement, the Sublease, the Power Transmission to Platform TSA, the Platform to Power Transmission TSA, the Trademark Cross-License, are the IP Cross-License are executory contracts as of the date hereof. Each of the Trademark Assignment, the Patents and Formulations Assignment and Confidentiality and Inventions Agreements Assignment are fully executed contracts as of the date hereof. The Amherst TSA previously terminated pursuant to its own terms.

WHEREAS, pursuant to the IT TSA, the Mark IV Entities provide, among other things, information technology infrastructure, business systems and services for each of the FRS Inc. manufacturing and office locations. Pursuant to the Supply Agreement, the Mark IV

2

Entities purchase approximately $7 million per year of radiator hoses, comprising over 1,000 parts and the tooling for the same, and fuel line systems from the Debtors.

**WHEREAS**, FRS Inc. and the Mark IV Entities entered into the Escrow Agreement to establish a $1 million reserve (the "Escrow") funded by the Mark IV Entities, to be held by Wells Fargo, and from which FRS Inc. could be paid in the event that certain warranty obligations or obligations with respect to the Debtors' Easley, South Carolina facility arose after the May 25, 2007 consummation of the 2007 Purchase Agreement. As of the date hereof, the Debtors have not asserted and are not currently aware of any claim assertable against the Escrow pursuant to the terms of the Escrow Agreement and the 2007 Purchase Agreement and, thus, the balance of the Escrow as of the Petition Date is approximately $1,043,181. The Escrow Agreement is scheduled to terminate upon the earlier of May 28, 2010, or the date on which FRS Inc., the Mark IV Entities and Wells Fargo collectively agree to terminate the Escrow Agreement. The Escrow Agreement provides that, upon its termination, the remaining balance in the Escrow is to be paid by Wells Fargo to the Mark IV Entities.

**WHEREAS**, pursuant to the terms of the Lease Assignment, Dayco assigned to FRS Inc. its obligations as tenant under that certain Lease, dated July 8, 2004 (the "Lease"), between First Industrial, L.P. (the "Landlord") and Dayco with respect to the premises located at 1935-1955 Enterprise Drive, Rochester Hills, Michigan (the "Leased Premises"). FRS Inc., in turn, subleased a portion of the Premises back to Dayco pursuant to the Sublease. The Landlord consented to the Lease Assignment, but expressly did not release Dayco from its obligations under the Lease. Accordingly, Dayco remains liable to the Landlord for the tenant's obligations under the Lease (i.e., as a guarantor in the event of payment or other defaults by FRS Inc.).

3

**B.    Proposed Sale to FRS Holding**

WHEREAS, as of February 6, 2009 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases and immediately filed a motion (the "Sale and Bid Procedures Motion") seeking a Bankruptcy Court order (the "Proposed Sale Order") approving, and authorizing the Debtors to enter into and consummate, that certain Asset Purchase Agreement, dated as of February 6, 2009, among FRS Holding, and the Debtors (the "Proposed Purchase Agreement"), pursuant to which the Debtors would sell (the "Proposed Sale") to FRS Holding substantially all of the Debtors' assets relating to their hose extrusion operations, fuel hose assembly and power steering service businesses, including their respective activities relating to the development, manufacture, assembly, distribution, service and sale of fuel filler assembly, power steering service assembly and hose extrusion products, including without limitation, the Debtors' Big Rapids, Michigan facility (as defined in the Proposed Purchase Agreement, the "Business"). The Proposed Sale Order would also approve the Debtors' assumption and assignment to FRS Holding of certain contracts specified in the schedules to Proposed Purchase Agreement.

WHEREAS, on February 19, 2009, the Bankruptcy Court entered an Order that, among other things, (i) schedules a hearing (the "Sale Hearing") on March 24, 2009 for the Bankruptcy Court to consider approval of the Proposed Sale pursuant to the Proposed Purchase Agreement, (ii) approves the procedures and deadlines for other parties to submit competing purchase bids for the Business and the Debtors' assets, and (iii) establishes deadlines and procedures for asserting and resolving cure claims with respect to contracts and leases proposed to be assumed and assigned to FRS Holding.

4

WHEREAS, the services provided by the Mark IV Entities pursuant to the IT TSA have been and continue to be critical to the Debtors and will be critical to FRS Holding after it acquires the Business. Both the Debtors and FRS Holding will require the services currently provided by the Mark IV Entities under the IT TSA after closing the Proposed Sale.

WHEREAS, the Debtors and FRS Holding requested that the Mark IV Entities agree to amend and restate the Supply Agreement to, among other things, provide for pricing increases and payment upon delivery of the various parts subject there, in lieu of the existing payment terms, which agreement would be assumed by the Debtors as amended and purchased by FRS Holding pursuant to the Proposed Sale. The Debtors and FRS Holding have also advised the Mark IV Entities that they intend for the Debtors to seek to (i) assume and assign to FRS Holding the remaining executory obligations under the Trademark Cross-License and the IP Cross-License, and (ii) reject the remaining executory obligations under the 2007 Purchase Agreement.

C. Comprehensive Resolution of Outstanding Issues

WHEREAS, the Mark IV Entities are willing to (a) amend and restate the IT TSA in order to provide services, on a flat fee rate for a term of six (6) months, to each of (i) FRS Holding, with respect to operations related to the Business, and (ii) the Debtors, with respect to their remaining business operations after the Proposed Sale, (b) amend and restate the Supply Agreement to, among other things, (i) have a remaining term of six (6) months after the Effective Date (defined below) subject to the negotiation of an extension(s) or a new agreement with FRS Holding during such term, and (ii) reduce payment terms for parts subject to the agreement, and (c) treat any and all cure claims with respect to the IT TSA, Supply Agreement, the Trademark Cross-License and the IP Cross-License (collectively, the "Cure Claims") as

5

prepetition general unsecured claims against the Debtors; provided that (x) the Debtors agree to terminate the Escrow Agreement and distribute the proceeds in the Escrow, less any outstanding fees owing to Wells Fargo under the Escrow Agreement, to the Mark IV Entities as consideration and in exchange for the Mark IV Entities' consent and agreement to, among other things, (i) enter into this Settlement Agreement, (ii) amend and restate the IT TSA and the Supply Agreement, and (iii) treat the Cure Claims as prepetition general unsecured claims, (y) the Debtors agree to allow as prepetition general unsecured claims against the Debtors the Mark IV Entities' (i) Cure Claims and (ii) damages claims against the Debtors arising from rejection of the Lease, the Sublease and the 2007 Purchase Agreement, and (z) the Debtors agree to a general release of any and all claims they may have against the Mark IV Entities, except as expressly set forth herein.

WHEREAS, the Debtors have determined in their business judgment that the comprehensive settlement and compromise and releases set forth herein are in the best interests of the Debtors, their estates and creditors and parties in interest because, among other things, this Settlement Agreement will help facilitate approval and consummation of the Proposed Sale, which the Debtors have separately determined is in the best interests of the Debtors, their estates and creditors and parties in interest as more fully set forth in the Sale and Bid Procedures Motion.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by and between the Debtors, the Mark IV Entities and FRS Holding, subject to approval of the Bankruptcy Court, as follows:

6

1. Recitals. The parties hereto adopt the recitals as true and correct statements of fact.

2. Amendment and Restatement and Assumption and Assignment of the IT TSA. On the Effective Date, (a) the amended and restated IT TSA attached hereto as Exhibit B, between the Mark IV Entities, FRS Inc. and FRS Holding, as purchaser of the Debtors' Business operations (the "FRS Holding Services Agreement"), shall be, and shall be deemed to be, effective and contemporaneously therewith assumed by the Debtors and assigned to FRS Holding, and (b) the amended and restated IT TSA attached hereto as Exhibit C, between the Mark IV Entities and the Debtors (the "FRS Inc. Services Agreement"), shall be, and shall be deemed to be, effective and contemporaneously therewith assumed by the Debtors.

3. Amendment and Restatement of the Supply Agreement. On the Effective Date, the amended and restated Supply Agreement attached hereto as Exhibit D, between the Debtors, FRS Holding, as the purchaser of the Debtors' Business operations, and the Mark IV Entities (the "Amended and Restated Supply Agreement"), shall be, and shall be deemed to be, effective and contemporaneously therewith assumed by the Debtors and purchased by FRS Holding.

4. Performance under the IT TSA and Supply Agreement Prior to Effective Date. From and after entering into this Settlement Agreement until the Effective Date, the Debtors and the Mark IV Entities shall continue to perform under the terms of the IT TSA and the Supply Agreement outstanding as of the Petition Date. After the Effective Date, the Mark IV Entities and the Debtors shall perform under the FRS Inc. Services Agreement, and the Mark IV Entities and FRS Holding shall perform under the FRS Holding Services Agreement and the Amended and Restated Supply Agreement.

7

5.     Termination of the Escrow Agreement and Disbursement of the Escrow.
On the Effective Date, that certain Termination of Escrow Agreement attached hereto as Exhibit
E, among the Debtors, the Mark IV Entities and Wells Fargo (the "Escrow Termination
Agreement"), shall be, and shall be deemed to be, effective, and Wells Fargo shall immediately
distribute the Escrow in accordance with the terms thereof.

6.     Retention of Unsecured Claims.  Notwithstanding any other provision
herein to the contrary, the Mark IV Entities shall retain their rights to assert against the Debtors,
and the Debtors shall retain their rights to contest, general unsecured claims with respect to the
Mark IV Entities' Cure Claims and damages claims arising from rejection of the Lease, the
Sublease and the 2007 Purchase Agreement (the "Retained Claims").  The Retained Claims shall
not be released pursuant to the releases contained in this Settlement Agreement.

7.     Mark IV Entities Release of Debtors.  In consideration of the good and
valuable consideration received from the Debtors recited herein and in the agreements attached
hereto, the receipt and sufficiency of which is hereby acknowledged, the Mark IV Entities for
themselves and their direct and indirect subsidiaries, directors, officers, members, agents,
representatives and their respective successors and assigns, and all who claim by, through or by
virtue of any of the foregoing (individually and collectively the "Mark IV Releasors"), except as
otherwise set forth herein, including without limitation the Retained Claims, or in the attached
Related Agreements, hereby knowingly and voluntarily release, acquit and forever discharge the
Debtors and their former, current and future directors, officers, members, agents, representatives
and their respective successors and assigns, and all persons acting by, through or in concert with
any of them (collectively the "Debtor Releasees") from any and all actions, causes of action,
suits, complaints, claims, liabilities, counterclaims, third-party claims, remedies, debts, dues,

8

sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, assessments, agreements, promises, variances, trespasses, damages, punitive damages, statutory damages, judgments, extents, executions, charges and demands and all other obligations and liabilities of any kind or nature whatsoever previously existing, now existing or which may hereinafter arise, including any consequences whether known or unknown, arising in law or in equity and arising out of claims that have been, could have been or would be asserted by any of the collective Mark IV Releasors.

        8.     Debtors Release of Mark IV Entities.  In consideration of the good and valuable consideration received from Mark IV and Dayco recited herein and in the agreements attached hereto, the receipt and sufficiency of which is hereby acknowledged, the Debtors for themselves and their direct and indirect subsidiaries, directors, officers, members, agents, representatives and their respective successors and assigns, and all who claim by, through or by virtue of any of the foregoing (individually and collectively the "Debtor Releasors"), except as otherwise set forth herein or in the attached Related Agreements, hereby knowingly and voluntarily releases, acquits and forever discharges the Mark IV Entities and their former, current and future directors, officers, members, agents, representatives and their respective successors and assigns, and all persons acting by, through or in concert with any of them (collectively the "Mark IV Releasees") from any and all actions, causes of action, suits, complaints, claims, liabilities, counterclaims, third-party claims, remedies, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, assessments, agreements, promises, variances, trespasses, damages, punitive damages, statutory damages, judgments, extents, executions, charges and demands and all other obligations and liabilities of any kind or nature whatsoever previously existing, now existing or which may

9

hereinafter arise, including any consequences whether known or unknown, arising in law or in equity and arising out of claims that have been, could have been or would be asserted by any of the collective Debtor Releasors.

9. <u>General Release</u>. The parties agree that the releases set forth herein apply to all claims that are not expressly carved out of such releases, including those of which they may not be aware and which may not be mentioned in this Settlement Agreement. It is hereby acknowledged and understood that such releases are General Releases and are irrevocable. The Mark IV Releasors and the Debtor Releasors each represent and warrant that they either are the beneficial owners of, or have the authority from the beneficial owner to release the claims hereby released and to enter into this Settlement Agreement. The validity, performance and enforcement of the mutual releases contained herein shall be governed by the laws of the State of New York without regard to the choice of laws provisions thereof.

10. <u>Bankruptcy Court Approval</u>. This Settlement Agreement and each of the agreements attached as exhibits hereto remain subject to Bankruptcy Court approval. The Debtors shall file a motion with the Bankruptcy Court seeking approval of this Settlement Agreement and the respective agreements described herein and attached hereto so that the Bankruptcy Court may consider such motion and agreements at the Sale Hearing.

11. <u>Effective Date</u>. This Settlement Agreement and each of the Amended and Restated Supply Agreement, the FRS Inc. Services Agreement, the FRS Holding Services Agreement and the Escrow Termination Agreement (the "<u>Related Agreements</u>") shall not be effective until each and all of the following conditions have been satisfied or waived, to the extent waivable, by each of the Mark IV Entities, the Debtors and FRS Holding: (a) the Bankruptcy Court enters an order approving all of the provisions of this Settlement Agreement

10

and each of the Related Agreements attached hereto as exhibits, and such order becomes a final order; (b) the Bankruptcy Court grants the Sale Motion and enters the Sale Order approving the Proposed Sale to FRS Holding pursuant to the Proposed Purchase Agreement and such order becomes a final order; and (c) the Closing Date (as defined in the Proposed Purchase Agreement) occurs. The "Effective Date" shall be the first date upon which each and all of the preceding conditions have either been satisfied or waived in accordance with the terms of this Section 11.

12. Termination. In the event that the Effective Date does not occur, this Settlement Agreement and each of the Related Agreements described herein and attached hereto shall be, and shall be deemed to be, terminated and void and of no force and effect whatsoever as if the parties had never entered into such agreements, and each of the parties shall expressly retain all of its rights and remedies in existence as of the date immediately prior to entry into this Settlement Agreement.

13. Compromise of Claims. It is understood that this Settlement Agreement is a compromise of disputed claims and shall not be construed as an admission of liability of any party. No statement made or action taken in the negotiation of this Settlement Agreement may be used by any party for any purpose whatsoever.

14. Entire Understanding. This Settlement Agreement, including the Related Agreements described herein and attached hereto, constitutes the complete understanding and agreement of the parties, fully supersedes any and all prior understandings or agreements between the parties pertaining to the subject hereof and may not be changed except by a writing signed by the parties.

15. Counterparts and Authorization. This Settlement Agreement may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronically,

11

and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

16.     Amendments and Waivers. This Settlement Agreement constitutes the entire agreement between the parties hereto and may not be modified, altered, amended or vacated without the written consent of all parties hereto.

17.     Binding Effect. This Settlement Agreement shall be binding upon and shall inure to the benefit of each party and its respective successors, assigns, heirs, and personal representatives, as applicable.

18.     Governing Law; Interest. This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of New York.

19.     Bankruptcy Court Jurisdiction. The Bankruptcy Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Settlement Agreement and any of the agreements attached hereto.

DB1/62710454.2

WHEREOF, the parties execute this Settlement Agreement, effective as of the date first set forth above.

DEBTORS:

Fluid Routing Solutions Intermediate Holding Corp.

_____
By: John C. Carson
Its: Chief Financial Officer

Fluid Routing Solutions, Inc.

_____
By: John C. Carson
Its: Chief Financial Officer

Fluid Routing Solutions Automotive, LLC

_____
By: John C. Carson
Its: Chief Financial Officer

Detroit Fuel, Inc.

_____
By: John C. Carson
Its: Chief Financial Officer

PROPOSED PURCHASER

FRS Holding Corp.

_____
By: Michael Laisure
Its: CEO & President

13

# MARK IV ENTITIES

## Mark IV Industries, Inc.

By: Mark G. Barberio
Its: Chief Financial Officer

## Dayco Products, LLC

By: Mark G. Barberio
Its: Chief Financial Officer

14

## Other Agreements Between FRS Inc. and the Mark IV Entities

Dayco/Mark IV to FRS Transition Services Agreement, dated as of May 25, 2007, between the Mark IV Entities and FRS Inc. (the "Power Transmission to Platform TSA");

FRS to Dayco/Mark IV Transition Services Agreement, dated as of May 25, 2007, between FRS Inc. and the Mark IV Entities (the "Platform to Power Transmission TSA");

Amherst to FRS Transition Services Agreement, dated as of May 25, 2007, between Mark IV and FRS Inc. (the "Amherst TSA");

Trademark Cross-License Agreement, dated as of May 25, 2007, between the Mark IV Entities and FRS Inc. (the "Trademark Cross-License");

Assignment of Trademark, dated as of May 25, 2007, between Dayco and FRS Inc. (the "Trademark Assignment");

Intellectual Property Cross-License Agreement, dated as of May 25, 2007, among the Mark IV Entities and FRS Inc. (the "IP Cross-License");

Assignment of Patents and Formulations, dated as of May 25, 2007, between the Mark IV Entities and FRS Inc. (the "Patents and Formulations Assignment"); and

Assignment of Confidentiality and Assignment of Inventions Agreements, dated as of May 25, 2007, among Mark IV, FRS Automotive, Dayco, DFTC, FRS Inc. and FRS Canada Corp. (the "Confidentiality and Inventions Agreements Assignment").

DB1/62710454.2

FRS Holding Services Agreement

DB1/62710454.2

# INFORMATION TECHNOLOGY SERVICES AGREEMENT
## (FRS Holding)

This INFORMATION TECHNOLOGY SERVICES AGREEMENT (the "Agreement") dated as of March 23, 2009, is entered into by and among MARK IV INDUSTRIES, INC., a Delaware corporation ("Mark IV"), DAYCO PRODUCTS, LLC, a Delaware limited liability company ("Dayco" and together with Mark IV, the "Providers" and individually each a "Provider"), FLUID ROUTING SOLUTIONS, INC. ("FRS Inc." or the "Debtor"), a debtor and debtor-in-possession in chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 09-10384 (CSS) (Jointly Administered), and FRS HOLDING CORP., a Delaware corporation ("FRS Holding" or the "Recipient"), the proposed purchaser of certain of the Debtors' assets and business operations. This Agreement shall become effective only upon the occurrence of the Effective Date defined in that certain Settlement Agreement and Release, dated March 23, 2009, among the Debtor, certain of its debtor affiliates in the Chapter 11 Cases, the Providers and the Recipient (the "Settlement Agreement"). Until the earlier of the Effective Date or rejection of the Initial Agreement, the Initial Agreement shall remain in full force and effect. Each of the Providers, the Debtor and the Recipient is hereinafter referred to individually as a "Party" and together as the "Parties."

WHEREAS, pursuant that certain Purchase Agreement dated as of May 25, 2007 (the "2007 Purchase Agreement"), among the Mark IV, Dayco, Dayco Fluid Technologies Corp. ("DFTC"), FRS Inc., and Fluid Routing Solutions Canada Corp. ("FRS Canada"), Mark IV sold all of the capital stock of Mark IV Automotive, LLC (now know as Fluid Routing Solutions Automotive, LLC) to FRS Inc., and Dayco and DFTC sold certain of their assets to FRS Inc. and FRS Canada; and

WHEREAS, certain of Mark IV's, Dayco's and DFTC's information technology systems and software were not sold to FRS Inc. pursuant to the 2007 Purchase Agreement; and

WHEREAS, pursuant to that certain Information Technologies Transition Services Agreement (the "Initial Agreement"), dated as of May 25, 2007, among the Providers and the Debtor, the Debtor agreed to purchase from the Providers, and the Providers agreed to provide to the Debtor, certain transitional information systems support services on the terms and conditions set forth in the Initial Agreement; and

WHEREAS, on February 6, 2009 (the "Petition Date"), the Debtor and certain of its affiliates (collectively, the "Debtors") commenced the Chapter 11 Cases and immediately filed a motion (the "Sale and Bid Procedures Motion") seeking a Bankruptcy Court order (the "Proposed Sale Order") approving, and authorizing the Debtors to enter into and consummate, that certain Asset Purchase Agreement, dated as of February 6, 2009, among FRS Holding, and the Debtors (the "Proposed Purchase Agreement"), pursuant to which the Debtors would sell (the "Proposed Sale") to FRS Holding substantially all of the Debtors' assets relating to their hose extrusion operations, fuel hose assembly and power steering service businesses, including their

respective activities relating to the development, manufacture, assembly, distribution, service and sale of fuel filler assembly, power steering service assembly and hose extrusion products, including without limitation, the Debtors' service operations located at their Big Rapids, Michigan facility (as defined in the Proposed Purchase Agreement, the "Business"); and

WHEREAS, in the event that the Bankruptcy Court approves the Proposed Sale pursuant to the Proposed Purchase Agreement and the Proposed Sale closes, Recipient desires to purchase from Providers, and Providers are willing to continue provide to Recipient, pursuant to the terms and conditions set forth in this Agreement, the same transitional information systems support services provided under the Initial Agreement with respect to the Business assets and operations purchased by Recipient, including but not limited to the Debtors' operations at their facilities in Big Rapids, Michigan, Lexington, Tennessee, Ocala, Florida, and Rochester Hills, Michigan (as opposed to the assets and operations of the business that would remain with the Debtors after the Proposed Sale, which consist primarily of, but are not limited to, the Debtors' facility in Easley, South Carolina (the "Remaining Business"); and

WHEREAS, effective as of the Effective Date, this Agreement amends and restates the Initial Agreement with respect to the Business assets and operations purchased by the Recipient; and

WHEREAS, on even date herewith, the Providers and the Debtor have entered into a similar agreement that amends and restates the Initial Agreement with respect to the Remaining Business assets and operations (the "Debtors Agreement"), which also shall become effective only upon the occurrence of the Effective Date; and

WHEREAS, upon the occurrence of the Effective Date, the Initial Agreement shall have been amended and restated in its entirety by this Agreement and the Debtors' Agreement and the Providers shall have no further obligations under the Initial Agreement; and

WHEREAS, upon the occurrence of the Effective Date, this Agreement automatically shall be, and shall be deemed to be, assumed by the Debtor and assigned to the Recipient pursuant to the terms of the Settlement Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

1.    Definitions. Capitalized terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the 2007 Purchase Agreement.

2

2.      Provision of Services.

        (a)      During the term of this Agreement as set forth in Section 6, the Providers or a designee acting on a Provider's behalf shall provide to the Recipient: (i) the services set forth on Exhibit A hereto and (ii) any other services requested by the Recipient in writing that were provided by the Providers, either directly or indirectly, pursuant to the Initial Agreement to the Business (but not solely to the Remaining Business) prior to the Effective Date and are reasonably required by the Recipient (each service described in clauses (i) and (ii) a "Service" and collectively the "Services").

        (b)      Unless expressly required by Exhibit A or otherwise agreed in writing by the Parties, the Providers or a designee acting on a Provider's behalf shall be required to perform the Services in a manner (including, without limitation, with respect to quality, timeliness, nature, accuracy, completeness, responsiveness and efficiency) consistent with the manner in which the Providers (either directly or indirectly) provided those services to the Business pursuant to the Initial Agreement prior to the Effective Date. In addition to the foregoing, the Providers or a designee acting on a Provider's behalf shall give substantially equally priority and provide substantially equal treatment to the Services as other services of similar nature and scope provided by such Providers to itself or third parties.

        (c)      The Recipient shall use the Services for substantially the same purposes and in substantially the same manner as the Business had used the Services prior to the Effective Date. The Providers shall be required to provide the Services only to the Recipient and/or its affiliates in connection with the conduct of the Business. The Recipient and/or its affiliates shall not resell any of the Services to any Person whatsoever or permit the use of the Services by any Person other than in connection with the conduct of the Business in the ordinary course consistent with past practice.

        (d)      The Providers shall maintain sufficient resources to perform its obligations pursuant to this Agreement, and the Providers shall be solely responsible for obtaining, paying for, and maintaining all contracts, consents, equipment, software, licenses, personnel, facilities and other resources and rights necessary for the provision and receipt of Services under this Agreement.

3.      Access. The Recipient shall make available on a timely basis to the Providers all information and materials reasonably requested by the Providers to enable them to provide the Services hereunder. The Recipient shall give the Providers reasonable access, upon reasonable prior notice, during regular business hours and at such other times as are reasonably required, to the Recipient's premises or the premises of the Business for the purpose of providing the Services hereunder.

4.    Payment; Accounting of Services.

(a)    The total monthly fee for all Services provided under this Agreement shall be a flat rate of $93,750.00 per month (the "Monthly Payment"). The Recipient shall pay the Providers for such Services in advance for each month on the first business day of such month. If the Providers have not received the Monthly Payment for Services for a particular month by the fifth business day of that month, then the Providers shall have no obligation to continue providing the Services under this Agreement until and unless the Recipient has paid all outstanding Monthly Payments and all accrued and unpaid interest thereon; provided that a Monthly Payment not paid in advance on the first day of a month shall bear interest at an annual rate equal to the then-current prime or base rate of Citibank, N.A. plus one (1) percentage point, until the date such Monthly Payment is paid in full.

(b)    The Providers shall send to the Recipient after the end of each month during which Services were provided, but in any event no later than the tenth business day of such month, an accounting of Services, showing the Services provided to the Recipient during such month. Each such accounting of Services shall detail separately the Services provided during such month.

5.    Taxes. Any Taxes assessed on the provision of the Services hereunder shall be paid by Recipient (other than any income Taxes on amounts paid to the Providers by the Recipient pursuant to the terms hereof).

6.    Term. The Providers shall provide each of the Services from the Effective Date through the date that is one hundred and eighty (180) days after the Effective Date (the "Termination Date"); provided, however, that, pursuant to Section 7(a), the Recipient may terminate this Agreement prior to the expiration of such term. This Agreement automatically expires, without notice, at Midnight (Eastern Time) on the Termination Date if not otherwise terminated prematurely pursuant Section of this Agreement.

7.    Termination.

(a)    This Agreement is terminable by the Recipient upon sixty (60) days prior written notice to the Providers. Additionally, the Recipient may terminate the specific portion of the Services which relates to the Providers' provision and management of the Recipient's email operations upon thirty (30) days prior written notice, and, in such event, the Monthly Payment shall be reduced by $4,000 (to a flat rate of $89,750.00 per month).

(b)    This Agreement may be terminated prior to the expiration of its stated term, upon written notice as set forth below:

4

(i)     by the Providers, if the Recipient commits a material breach of any provision of this Agreement (including the failure to make payments when due) and such breach continues for a period of thirty (30) calendar days following a written request to cure such breach; or

(ii)    by the Recipient, if either Provider commits a material breach of any provision of this Agreement (including the provision of the Services in accordance with the terms and conditions set forth in Exhibit A hereto) and such breach continues for a period of thirty (30) calendar days following a written request to cure such breach.

8.     Cooperation; Representatives.  The Providers and the Recipient shall use good faith efforts to reasonably cooperate with each other in all matters relating to the provision and receipt of Services.  Each of the Providers and the Recipient shall appoint a representative (a "Representative") to facilitate communications and performance under this Agreement. Providers may treat an act of a Representative of the Recipient as being authorized by the Recipient without inquiring behind such act or ascertaining whether such Representative had authority to so act, and the Recipient may treat an act of a Representative of the Providers as being authorized by the Providers without inquiring behind such act or ascertaining whether such Representative had authority to so act. The initial Representatives shall be the individuals set forth in Exhibit B hereto. Each Party shall have the right at any time and from time to time to replace its Representatives by giving notice in writing to the other Party setting forth the name of (a) the Representative to be replaced and (b) the replacement, and certifying that the replacement Representative is authorized to act for the Party giving the notice in all matters relating to this Agreement.

9.     Consequential and Other Damages.  Notwithstanding anything to the contrary contained in this Agreement, the liability of the Providers to the Recipient, or the Recipient to the Providers, with respect to this Agreement or anything done in connection herewith, including but not limited to the performance or breach hereof, or from the sale, delivery, provision or use of any of the Services provided under or pursuant to this Agreement, whether in contract, in tort (including negligence and strict liability) or otherwise, shall not exceed the fees paid and to be paid to the Providers by the Recipient pursuant to this Agreement during the stated term hereof; provided: (i) the foregoing limitation shall not apply to liability arising out of the willful misconduct of, or intentional breach of this Agreement by, a Party; (ii) the foregoing limitation shall not apply to any indemnification obligation under Section 10, which obligation shall instead be limited to fifteen million dollars ($15,000,000); and (iii) the Recipient shall, in all circumstances and notwithstanding anything to the contrary contained in this Agreement, be entitled to a Provider's specific performance of its obligations under this Agreement.

10.    Indemnification.

(a)     The Providers hereby agree to indemnify and hold harmless the Recipient and its officers, directors, employees, stockholders, agents and representatives (the "Recipient

Indemnitees") from and against any and all third-party claims (and any and all losses, damages, liabilities, obligations, costs or expenses, including reasonable third-party legal, expert or consulting fees and expenses relating thereto (collectively, "Losses")) arising out of or resulting from a claim of intellectual property infringement or misappropriation (whether in contract or tort) relating to a Provider's performance of the Services hereunder.

(b)     If a Recipient Indemnitee (the "Indemnified Party") receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third-party or the imposition of any penalty or assessment for which indemnity may be sought under this Section 10 (a "Third Party Claim") and the Indemnified Party intends to seeks indemnity pursuant to this Section 10, the Indemnified Party shall promptly provide the Providers with written notice of such Third Party Claim.

11.     Independent Contractor.  At all times during the term of this Agreement, the Providers and their designee(s), if any, shall be independent contractors in providing the Services hereunder with the sole right to supervise, manage, operate, control and direct the performance of the Services and the sole obligation to employ, compensate and manage their employees and business affairs.  Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any Party with respect to the indebtedness, liabilities, obligations or actions of the other Party or any of its respective officers, directors, employees, stockholders, agent or representatives.

12.     Force Majeure.  The Providers shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, embargo, natural disaster, acts of God, flood, fire, sabotage, delay in transportation, or intervention by governmental entities.  Upon the occurrence of any such event which results in, or will result in, delay or failure to perform according to the terms of this Agreement, the Providers shall immediately give notice to the Recipient of such occurrence and the effect and/or anticipated effect of such occurrence.   The Providers shall use their reasonable efforts to minimize disruptions in their performance and to resume performance of their obligations under this Agreement as soon as practicable.  Notwithstanding anything to the contrary in this Agreement, the Recipient may, in its sole discretion, elect to extend the term of the affected Service(s) for a period commensurate with the period during which the Providers are unable to perform pursuant to any such event.

13.     WARRANTIES.  THE PROVIDERS WARRANT THAT THE PROVIDERS WILL USE THE SAME STANDARD OF CARE WHEN PROVIDING THE SERVICES UNDER THIS AGREEMENT THAT THE PROVIDERS USED WHEN CONDUCTING THE BUSINESS UNDER THEIR OWNERSHIP.    THE PROVIDERS MAKE NO OTHER WARRANTY WITH RESPECT TO THE SERVICES PROVIDED FOR IN THIS AGREEMENT.

6

14.     Confidential Information. Each Party shall keep confidential, and cause its affiliates and instruct its and their officers, directors, employees and advisors to keep confidential, all information contemplated by this Agreement, except as required by law or administrative process and except for information that is available to the public after the date of this Agreement or thereafter becomes available to the public other than as a result of a breach of this Section 14. Except with respect to trade secrets, the covenant set forth in this Section 14 shall terminate one (1) year after the expiration of the term of this Agreement.

15.     Assignment. This Agreement and the rights and obligations of the Parties hereunder shall not be assignable by the Providers or the Recipient without the prior written consent of the other Part(ies) hereto, except that: (a) the Providers may assign this Agreement and its rights and obligations under this Agreement without the prior written consent of the Recipient to a bona fide third party acquirer of all or substantially all of the assets to which this Agreement relates who would have aggregate gross revenues, calculated on a pro forma basis to reflect the acquisition from Providers, of $500 million or more; and (b) the Recipient may, without the prior written consent of the Providers, assign its rights and obligations under this Agreement, in whole but not in part, to: (i) one or more of its affiliates; (ii) any entity that acquires all or substantially all of the assets to which this Agreement relates; and/or (iii) a lender for purposes of collateral security; provided, in the cases of (i) and (ii), any such assignee must agree in writing to be bound by the terms and conditions of this Agreement. Subject to the first sentence of this Section 15, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Any attempted assignment in violation of this Section 15 shall be void.

16.     No Third Party Beneficiaries. Except as provided in Section 10, this Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties hereto and such assigns, any legal or equitable rights hereunder.

17.     Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid), or (b) three (3) days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to the Recipient and the Providers shall be sent to the addresses indicated below:

(i)     if to Providers,

Mark IV Industries, Inc.
501 John James Audubon Parkway
Amherst, New York 14228
Attention: Mark G. Barberio
Telecopy: (716) 689-6098

7

and

Dayco Products, LLC
1 Prestige Place
Miamisburg, Ohio 45342
Attention: Karen Rogers
Telecopy: (937) 226 -5753

with a copy to (which shall not constitute notice to Providers):

Skadden, Arps, Slate, Meagher & Flom, LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Attn:   J. Eric Ivester
        Stephen D. Williamson
Telecopy: (312) 407-0411; and

(ii)    if to Recipient,

Fluid Routing Solutions Intermediate Holding Corp.
5200 Town Center Circle, Suite 600
Boca Raton, Florida 33486
Attn:   Jason H. Neimark, David Blechman and C. Deryl Couch
Telecopy: (561) 394-0540

with a copy to (which shall not constitute notice to Recipient):

Kirkland & Ellis LLP
200 East Randolph
Chicago, IL 60601
Attn: Jeffrey A. Fine, Esq.
Telecopy: (312) 861-2200

18.     Interpretation: Exhibits. The headings contained in this Agreement are for
reference purposes only and shall not affect in any way the meaning or interpretation of this
Agreement.    Whenever the words "include", "includes" or "including" are used in this
Agreement, they shall be deemed to be followed by the words "without limitation". The word
"or" shall not be deemed exclusive unless the context requires otherwise. The words "hereof",
"herein", "hereby" and "hereunder" and words of similar import when used in this Agreement
shall refer to this Agreement as a whole and not to any particular provision of this Agreement.
The word "extent" in the phrase ''to the extent'' shall mean the degree to which a subject or other
thing extends, and such phrase shall not mean simply "if." The definitions contained in this
Agreement are applicable to the singular as well as the plural forms of such terms. All Exhibits
attached hereto are hereby incorporated in and made a part of this Agreement as if set forth in
full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein, shall
have the meaning as defined in this Agreement. When a reference is made in this Agreement to

8

a Section or Exhibit, such reference shall be to a Section of, or an Exhibit to, this Agreement unless otherwise indicated.

19. Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Parties.

20. Entire Agreement. This Agreement, the Settlement Agreement and the agreements and documents described in and attached as exhibits to the Settlement Agreement, contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings between the Parties relating to such subject matter. No Party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein, in the Settlement Agreement or in the agreements and documents described in and attached as exhibits to the Settlement Agreement. In the event of any conflict between the provisions of this Agreement (including the Exhibits hereto), on the one hand, and the provisions of the Settlement Agreement, on the other hand, the Settlement Agreement shall control.

21. Severability. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

22. Governing Law. THE LAW OF THE STATE OF NEW YORK, TO THE EXTENT JUSTICIABLE THEREUNDER, SHALL GOVERN ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, INTERPRETATION AND ENFORCEABILITY OF THIS AGREEMENT AND THE EXHIBITS ATTACHED HERETO, AND THE PERFORMANCE OF THE OBLIGATIONS IMPOSED BY THIS AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

23. Dispute Resolution.

(a) Any controversy, claim or dispute between the Parties arising out of or relating to a provision of this Agreement or the breach, termination or a validity thereof shall, upon written request of either Party, immediately be referred jointly for resolution to senior

9

executives of each of the Parties who have authority to settle the controversy and who are at a higher level of management than the person(s) with direct responsibility for day-to-day administration of this Agreement. The written request shall set forth the details of the claim. Within fifteen (15) days after delivery of the written request of a Party, the receiving Party shall submit to the other a written response. The request notice and the response shall each include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of any other person who will accompany the senior executive. Within thirty (30) days after delivery of the disputing Party's request notice, the senior executives of both Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt in good faith to resolve the controversy. The Parties agree to honor all reasonable requests for information. All negotiations pursuant to this provision shall be confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

(b)     If any such controversy, claim or dispute has not been resolved by negotiation within forty-five (45) days of the disputing Party's request notice, or if the Parties failed to meet within thirty (30) days of such request notice, then each of the Parties agrees that such controversy, claim or dispute shall be finally and completely settled without appeal by arbitration in New York, New York under the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") in effect as of the date of the request for arbitration, which rules are deemed to be incorporated into this Section 23(b); provided, however, that in the event of any conflict between such rules and the other provisions of this Agreement, such other provisions of this Agreement shall control. The arbitration shall be conducted before a panel of three (3) arbitrators. Each Party shall appoint one (1) arbitrator within thirty (30) days of receiving notice of the request for arbitration in accordance with the Commercial Arbitration Rules of the AAA. The two Party-appointed arbitrators shall then attempt to appoint a third arbitrator who shall act as the chairman of the panel (the "Chairman") within twenty (20) days of the appointment of the second arbitrator. If the Party-appointed arbitrators fail to agree on the Chairman within such period, the Chairman shall be appointed by the AAA upon the written request of either Party. Each Party shall be entitled to reasonable discovery rights, and issues as to discovery shall be determined by the arbitral panel applying the laws of the State of New York as provided in Section 22. The decision of the arbitrators shall be by majority vote, shall be in writing, shall set forth the facts found by the arbitrators to exist, their decision and the basis for that decision and shall be final and binding upon the Parties and not subject to appeal, and the judgment of any court of competent jurisdiction may be entered thereon. Except to the extent permitted by the express terms of this Agreement, the arbitral panel shall not have the authority to award any consequential, punitive, special, exemplary or incidental damages. The arbitrators shall award the costs and expenses of the arbitration, including reasonable attorneys' fees, disbursements, arbitration expense, arbitrators' fees and the administrative fee of the AAA, to the prevailing Party as shall be determined by the arbitrators.

(c)     Notwithstanding anything to the contrary in this Agreement, no provision of this Agreement shall prohibit Recipient from seeking equitable relief, including, without limitation, for a Provider's specific performance of this Agreement, in any court of law or equity.

10

24. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

25. Amendments and Waivers. This Agreement may not be amended, modified, superseded or cancelled except by an instrument in writing signed on behalf of each Party hereto. By an instrument in writing, either Party may waive compliance by the other Party with any term or provision of this Agreement that such other Party was obligated to comply with or perform. No delay or omission by either Party to exercise any right or power under this Agreement or pursuant to applicable law shall impair such right or power or be construed as a waiver thereof. A waiver by a Party of any of the covenants to be performed by the other Party or any breach shall not be construed to be a waiver of any succeeding breach or of any other covenant. The failure by any Party to enforce any term of this Agreement shall not be deemed to be a waiver of future enforcement of that or any other term of this Agreement.

26. Survival. The provisions of Sections 4, 5, 7(b), 9, 13, 17, 22-24 and 26 shall survive the expiration or earlier termination of this Agreement for any reason whatsoever.

* * *

11

IN WITNESS WHEREOF, the Debtor, the Providers and the Recipient have duly executed this Agreement as of the date first written above.

DEBTORS:

**Fluid Routing Solutions, Inc.**

_____

By: John C. Carson
Its: Chief Financial Officer

RECIPIENT:

**FRS Holding Corp.**

_____

By: Michael Laisure
Its: CEO & President

PROVIDERS:

**Mark IV Industries, Inc.**

_____

By: Mark G. Barberio
Its: Chief Financial Officer

**Dayco Products, LLC**

_____

By: Mark G. Barberio
Its: Chief Financial Officer

# EXHIBIT A

## Services[1]

### 1. Hardware Support

The business application hardware is IBM AS400. Remote access shall be provided. A list of the relevant hardware is attached hereto as Attachment 1

All production equipment is currently covered by hardware maintenance.

### 2. Technical Services

Data Operations — Routine execution of system schedules, management of backup media, help desk support after hours and holidays. Available 24 by 7. This service is outsourced to Analyst International Group located in Auburn Hills, Michigan.

WAN Management — First responder to all network issues, router upgrade and maintenance,

Disaster Recovery — Annual testing of recovery plan.

AS400 Support Services (Production and Test) — Application of IBM PTF's (Program Temporary Fix), system tuning, performance monitoring and printer and external websites. Firewall Support - Monitoring and managing firewall systems to prevent unauthorized network entry.

### 3. AS400 Software Support

---

[1] Note: Services listed on Exhibit A are under review by FRS Holding.

AS400 Legacy Software Support – Design and development of new system or modification of existing systems as required by the end user.

COIN (Customer Order Entry, Sales and Finished Goods Inventory)
EDI (Electronic Data Interchange)
Financials (Accounts Receivable, Accounts Payable, General Ledger, Fixed Assets)
MRP and Shop Floor Control Engineering

AS400 Purchased Software Support – Application of updates provided by software vendor and made available by Providers, creation of unique reporting as defined by Recipient, including, without limitation:

Kronos — Time and Attendance
Cognos — Data warehousing
Gentran — EDI Translation
Infinium - Payroll and Benefits Processing
Support

AS400 Operating Software Support- Application of vendor provided upgrades and system keys made available by Providers, including, without limitation:

IBM Software Subscriptions
Help Systems Products
    *Robot Scheduler*
    *Robot Client*
    *Robot Reports*
Broderick
TL Ashford
Aldon
Pro Data
Hawkeye Pathfinder
TAA Tools

## 4. Help Desk/Training and Education

Phone support and online support for Recipient reporting of system issues or questions during standard business hours. Outsourced service for after hours and holidays.

Training and Education means assistance with Recipient's new system implementation and creation of documentation for all of Recipient's new systems or modifications

## 5. Information Systems Management

Provide overall Information Services guidance and direction necessary to maintain current level of operating stability and adherence to industry-accepted guidelines for accountability.

## 6. Telecommunications

All telecommunication administration, including, without limitation:

WAN – Data access, Internet access and related services.

Voice – Provide long distance telephone access and services,

Cellular – Provide cellular service access and services,

ANX – Provide access to Automotive Network Exchange.

I-Connect - Supplier and customer EDI communications portal.

Note: Capital equipment and software rights noted above will be maintained or replaced by the Providers as necessary at no additional cost to the Recipient (Attachment 1 hereto identifies the equipment utilized as of the date of this Agreement)

15

**Auburn Hills, Michigan Data Center**
IBM 3590 E11 Tape (Dual 1 of 2)
IBM 3590 E11 Tape (Dual 2 of 2)
IBM 3590 E11
IBM 810-2465
IBM 825-2473
Dell PIII 1Ghz 1.5Gb RAM 70GB HDD:Netflow
Dell P4 2.4Ghz 256Mb RAM 40Gb HDD:Bkup DNS
HP PIII800Mhz 2.5Gb RAM 8Gb HDD:SMTP Gate
Dell Xeon 2.8Ghz 1.5Gb RAM 70Gb HDD:WebMail
Cisco ASA 5520 VPN Concentrator
Cisco ASA 5510 Firewall


**Rochester Hills, Michigan**
Dell PIII 733Mhz 768Mb RAM 18Gb HDD
Dell Ppro 200Mhz 256Mb RAM 40Gb HDD
Dell Xeon 2.8Ghz 3.8Gb RAM 370Gb HDD
Dell PIII850Mhz 1Gb RAM 60Gb HDD
Dell PII 350Mhz 256Mb RAM 18Gb HDD
Dell PIII 700Mhz 1Gb RAM 340Gb HDD
Dell PIII 1Ghz 2.5Gb RAM 100Gb HDD
Dell PIII300Mhz 512Mb RAM 27Gb HDD
Dell Xeon 1.9Ghz 3.5Gb RAM 550Gb HDD
Dell PIII 600Mhz 2.5Gb RAM 60Gb HDD
Dell Xeon 2.8Ghz 3Gb RAM 70Gb HDD

## EXHIBIT B

### Representatives

For Providers:

     Mark G. Barberio

     Karen Rogers

For Recipients:

     John Carson

**EXHIBIT C**

## FRS Inc. Services Agreement

DB1/62710454.2

## INFORMATION TECHNOLOGY SERVICES AGREEMENT
### (FRS Inc.)

This INFORMATION TECHNOLOGY SERVICES AGREEMENT (the "Agreement") dated as of March 23, 2009, is entered into by and among MARK IV INDUSTRIES, INC., a Delaware corporation ("Mark IV"), DAYCO PRODUCTS, LLC, a Delaware limited liability company ("Dayco" and together with Mark IV, the "Providers" and individually each a "Provider"), FLUID ROUTING SOLUTIONS, INC. ("FRS Inc." or the "Recipient"), a debtor and debtor-in-possession in chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 09-10384 (CSS) (Jointly Administered). This Agreement shall become effective only upon the occurrence of the Effective Date defined in that certain Settlement Agreement and Release, dated March [ ], 2009, among the Recipient, certain of its debtor affiliates in the Chapter 11 Cases, the Providers and FRS Holding Corp., a Delaware corporation ("FRS Holding") (the "Settlement Agreement"). Each of the Providers and the Recipient is hereinafter referred to individually as a "Party" and together as the "Parties."

WHEREAS, pursuant that certain Purchase Agreement dated as of May 25, 2007 (the "2007 Purchase Agreement"), among the Mark IV, Dayco, Dayco Fluid Technologies Corp. ("DFTC"), FRS Inc., and Fluid Routing Solutions Canada Corp. ("FRS Canada"), Mark IV sold all of the capital stock of Mark IV Automotive, LLC (now known as Fluid Routing Solutions Automotive, LLC) to FRS Inc., and Dayco and DFTC sold certain of their assets to FRS Inc. and FRS Canada; and

WHEREAS, certain of Mark IV's, Dayco's and DFTC's information technology systems and software were not sold to FRS Inc. pursuant to the 2007 Purchase Agreement; and

WHEREAS, pursuant to that certain Information Technologies Transition Services Agreement (the "Initial Agreement"), dated as of May 25, 2007, among the Providers and the Recipient, the Recipient agreed to purchase from the Providers, and the Providers agreed to provide to the Recipient, certain transitional information systems support services on the terms and conditions set forth in the Initial Agreement; and

WHEREAS, on February 6, 2009 (the "Petition Date"), the Recipient and certain of its affiliates (collectively, the "Debtors") commenced the Chapter 11 Cases and immediately filed a motion (the "Sale and Bid Procedures Motion") seeking a Bankruptcy Court order (the "Proposed Sale Order") approving, and authorizing the Debtors to enter into and consummate, that certain Asset Purchase Agreement, dated as of February 6, 2009, among FRS Holding, and the Debtors (the "Proposed Purchase Agreement"), pursuant to which the Debtors would sell (the "Proposed Sale") to FRS Holding substantially all of the Debtors' assets relating to their hose extrusion operations, fuel hose assembly and power steering service businesses, including their respective activities relating to the development, manufacture, assembly, distribution, service and sale of fuel filler assembly, power steering service assembly and hose extrusion products,

including without limitation, the Debtors' service operations located at their Big Rapids, Michigan facility (as defined in the Proposed Purchase Agreement, the "<u>Business</u>"); and

WHEREAS, in the event that the Bankruptcy Court approves the Proposed Sale pursuant to the Proposed Purchase Agreement and the Proposed Sale closes Recipient desires to purchase from Providers, and Providers are willing to continue provide to Recipient, pursuant to the terms and conditions set forth in this Agreement, the same transitional information systems support services provided under the Initial Agreement with respect to the assets and operations of the business that would remain with the Debtors after the Proposed Sale, which consist primarily of, but are not limited to, the Debtors' facility in Easley, South Carolina (the "<u>Remaining Business</u>"); and

WHEREAS, effective as of the Effective Date, this Agreement amends and restates the Initial Agreement with respect to the Remaining Business assets and operations that remain with the Recipient; and

WHEREAS, on even date herewith, the Providers and FRS Holding have entered into a similar agreement that amends and restates the Initial Agreement with respect to the Business assets and operations purchased by FRS Holding (the "<u>FRS Holding Agreement</u>"), which also shall become effective only upon the occurrence of the Effective Date; and

WHEREAS, upon the occurrence of the Effective Date, the Initial Agreement shall have been amended and restated in its entirety by this Agreement and the FRS Holding Agreement and the Providers shall have no further obligations under the Initial Agreement; and

WHEREAS, upon the occurrence of the Effective Date, this Agreement automatically shall be, and shall be deemed to be, assumed by the Debtors pursuant to the terms of the Settlement Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

1.     <u>Definitions</u>.  Capitalized terms that are not otherwise defined in this Agreement shall have the meanings ascribed to them in the 2007 Purchase Agreement.

.2.     <u>Provision of Services</u>.

(a)     During the term of this Agreement as set forth in Section 6, the Providers or a designee acting on a Provider's behalf shall provide to the Recipient: (i) the services set

2

forth on Exhibit A hereto and (ii) any other services requested by the Recipient in writing that were provided by the Providers, either directly or indirectly, pursuant to the Initial Agreement to the Remaining Business (but not the Business) prior to the Effective Date and are reasonably required by the Recipient (each service described in clauses (i) and (ii) a "Service" and collectively the "Services").

(b)     Unless expressly required by Exhibit A or otherwise agreed in writing by the Parties, the Providers or a designee acting on a Provider's behalf shall be required to perform the Services in a manner (including, without limitation, with respect to quality, timeliness, nature, accuracy, completeness, responsiveness and efficiency) consistent with the manner in which the Providers (either directly or indirectly) provided those services to the Remaining Business pursuant to the Initial Agreement prior to the Effective Date. In addition to the foregoing, the Providers or a designee acting on a Provider's behalf shall give substantially equally priority and provide substantially equal treatment to the Services as other services of similar nature and scope provided by such Providers to itself or third parties.

(c)     The Recipient shall use the Services for substantially the same purposes and in substantially the same manner as the Remaining Business had used the Services prior to the Effective Date. The Providers shall be required to provide the Services only to the Recipient and/or its affiliates in connection with the conduct of the Remaining Business. The Recipient and/or its affiliates shall not resell any of the Services to any Person whatsoever or permit the use of the Services by any Person other than in connection with the conduct of the Remaining Business in the ordinary course consistent with past practice.

(d)     The Providers shall maintain sufficient resources to perform its obligations pursuant to this Agreement, and the Providers shall be solely responsible for obtaining, paying for, and maintaining all contracts, consents, equipment, software, licenses, personnel, facilities and other resources and rights necessary for the provision and receipt of Services under this Agreement.

3.     Access. The Recipient shall make available on a timely basis to the Providers all information and materials reasonably requested by the Providers to enable them to provide the Services hereunder. The Recipient shall give the Providers reasonable access, upon reasonable prior notice, during regular business hours and at such other times as are reasonably required, to the Recipient's premises or the premises of the Remaining Business for the purpose of providing the Services hereunder.

4.     Payment; Accounting of Services.

(a)     The total monthly fee for all Services provided under this Agreement shall be a flat rate of $31,250.00 per month (the "Monthly Payment"). The Recipient shall pay the Providers for such Services in advance for each month on the first business day of such month.

3

If the Providers have not received the Monthly Payment for Services for a particular month by the fifth business day of that month, then the Providers shall have no obligation to continue providing the Services under this Agreement until and unless the Recipient has paid all outstanding Monthly Payments and all accrued and unpaid interest thereon; provided that a Monthly Payment not paid in advance on the first day of a month shall bear interest at an annual rate equal to the then-current prime or base rate of Citibank, N.A. plus one (1) percentage point, until the date such Monthly Payment is paid in full.

(b) The Providers shall send to the Recipient after the end of each month during which Services were provided, but in any event no later than the tenth business day of such month, an accounting of Services, showing the Services provided to the Recipient during such month. Each such accounting of Services shall detail separately the Services provided during such month.

5. Taxes. Any Taxes assessed on the provision of the Services hereunder shall be paid by Recipient (other than any income Taxes on amounts paid to the Providers by the Recipient pursuant to the terms hereof).

6. Term. The Providers shall provide each of the Services from the Effective Date through the date that is one hundred and eighty (180) days after the Effective Date (the "Termination Date"); provided, however, that, pursuant to Section 7(a), the Recipient may terminate this Agreement prior to the expiration of such term. This Agreement automatically expires, without notice, at Midnight (Eastern Time) on the Termination Date if not otherwise terminated prematurely pursuant Section of this Agreement.

7. Termination.

(a) This Agreement is terminable by the Recipient upon sixty (60) days prior written notice to the Providers.

(b) This Agreement may be terminated prior to the expiration of its stated term, upon written notice as set forth below:

(i) by the Providers, if the Recipient commits a material breach of any provision of this Agreement (including the failure to make payments when due) and such breach continues for a period of thirty (30) calendar days following a written request to cure such breach; or

(ii) by the Recipient, if either Provider commits a material breach of any provision of this Agreement (including the provision of the Services in accordance with the

4

terms and conditions set forth in Exhibit A hereto) and such breach continues for a period of thirty (30) calendar days following a written request to cure such breach.

8.      Cooperation; Representatives.  The Providers and the Recipient shall use good faith efforts to reasonably cooperate with each other in all matters relating to the provision and receipt of Services.  Each of the Providers and the Recipient shall appoint a representative (a "Representative") to facilitate communications and performance under this Agreement. Providers may treat an act of a Representative of the Recipient as being authorized by the Recipient without inquiring behind such act or ascertaining whether such Representative had authority to so act, and the Recipient may treat an act of a Representative of the Providers as being authorized by the Providers without inquiring behind such act or ascertaining whether such Representative had authority to so act. The initial Representatives shall be the individuals set forth in Exhibit B hereto. Each Party shall have the right at any time and from time to time to replace its Representatives by giving notice in writing to the other Party setting forth the name of (a) the Representative to be replaced and (b) the replacement, and certifying that the replacement Representative is authorized to act for the Party giving the notice in all matters relating to this Agreement.

9.      Consequential and Other Damages.  Notwithstanding anything to the contrary contained in this Agreement, the liability of the Providers to the Recipient, or the Recipient to the Providers, with respect to this Agreement or anything done in connection herewith, including but not limited to the performance or breach hereof, or from the sale, delivery, provision or use of any of the Services provided under or pursuant to this Agreement, whether in contract, in tort (including negligence and strict liability) or otherwise, shall not exceed the fees paid and to be paid to the Providers by the Recipient pursuant to this Agreement during the stated term hereof; provided: (i) the foregoing limitation shall not apply to liability arising out of the willful misconduct of, or intentional breach of this Agreement by, a Party; (ii) the foregoing limitation shall not apply to any indemnification obligation under Section 10, which obligation shall instead be limited to fifteen million dollars ($15,000,000); and (iii) the Recipient shall, in all circumstances and notwithstanding anything to the contrary contained in this Agreement, be entitled to a Provider's specific performance of its obligations under this Agreement.

10.     Indemnification.

(a)     The Providers hereby agree to indemnify and hold harmless the Recipient and its officers, directors, employees, stockholders, agents and representatives (the "Recipient Indemnitees") from and against any and all third party claims (and any and all losses, damages, liabilities, obligations, costs or expenses, including reasonable third party legal, expert or consulting fees and expenses relating thereto (collectively, "Losses")) arising out of or resulting from a claim of intellectual property infringement or misappropriation (whether in contract or tort) relating to a Provider's performance of the Services hereunder.

5

(b)    If a Recipient Indemnitee (the "Indemnified Party") receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third-party or the imposition of any penalty or assessment for which indemnity may be sought under this Section 10 (a "Third Party Claim") and the Indemnified Party intends to seeks indemnity pursuant to this Section 10, the Indemnified Party shall promptly provide the Providers with written notice of such Third Party Claim.

11.    Independent Contractor.  At all times during the term of this Agreement, the Providers and their designee(s), if any, shall be independent contractors in providing the Services hereunder with the sole right to supervise, manage, operate, control and direct the performance of the Services and the sole obligation to employ, compensate and manage their employees and business affairs. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of employee/employer or principal/agent, or otherwise create any liability whatsoever of any Party with respect to the indebtedness, liabilities, obligations or actions of the other Party or any of its respective officers, directors, employees, stockholders, agent or representatives.

12.    Force Majeure.  The Providers shall not be in default hereunder by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to civil disturbances, riot, rebellion, invasion, epidemic, hostilities, war, embargo, natural disaster, acts of God, flood, fire, sabotage, delay in transportation, or intervention by governmental entities.  Upon the occurrence of any such event which results in, or will result in, delay or failure to perform according to the terms of this Agreement, the Providers shall immediately give notice to the Recipient of such occurrence and the effect and/or anticipated effect of such occurrence.   The Providers shall use their reasonable efforts to minimize disruptions in their performance and to resume performance of their obligations under this Agreement as soon as practicable.  Notwithstanding anything to the contrary in this Agreement, the Recipient may, in its sole discretion, elect to extend the term of the affected Service(s) for a period commensurate with the period during which the Providers are unable to perform pursuant to any such event.

13.    WARRANTIES.  THE PROVIDERS WARRANT THAT THE PROVIDERS WILL USE THE SAME STANDARD OF CARE WHEN PROVIDING THE SERVICES UNDER THIS AGREEMENT THAT THE PROVIDERS USED WHEN CONDUCTING THE BUSINESS UNDER THEIR OWNERSHIP.   THE PROVIDERS MAKE NO OTHER WARRANTY  WITH  RESPECT  TO  THE  SERVICES  PROVIDED  FOR  IN  THIS AGREEMENT.

14.    Confidential Information.   Each Party shall keep confidential, and cause its affiliates and instruct its and their officers, directors, employees and advisors to keep confidential, all information contemplated by this Agreement, except as required by law or administrative process and except for information that is available to the public after the date of this Agreement or thereafter becomes available to the public other than as a result of a breach of this Section 14.

6

Except with respect to trade secrets, the covenant set forth in this Section 14 shall terminate one (1) year after the expiration of the term of this Agreement.

15. Assignment. This Agreement and the rights and obligations of the Parties hereunder shall not be assignable by the Providers or the Recipient without the prior written consent of the other Part(ies) hereto, except that: (a) the Providers may assign this Agreement and its rights and obligations under this Agreement without the prior written consent of the Recipient to a bona fide third party acquirer of all or substantially all of the assets to which this Agreement relates who would have aggregate gross revenues, calculated on a pro forma basis to reflect the acquisition from Providers, of $500 million or more; and (b) the Recipient may, without the prior written consent of the Providers, assign its rights and obligations under this Agreement, in whole but not in part, to: (i) one or more of its affiliates; (ii) any entity that acquires all or substantially all of the assets to which this Agreement relates; and/or (iii) a lender for purposes of collateral security; provided, in the cases of (i) and (ii), any such assignee must agree in writing to be bound by the terms and conditions of this Agreement. Subject to the first sentence of this Section 15, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Any attempted assignment in violation of this Section 15 shall be void.

16. No Third Party Beneficiaries. Except as provided in Section 10, this Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties hereto and such assigns, any legal or equitable rights hereunder.

17. Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid), or (b) three (3) days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to the Recipient and the Providers shall be sent to the addresses indicated below:

    (i)  if to Providers,

      Mark IV Industries, Inc.
      501 John James Audubon Parkway
      Amherst, New York 14228
      Attention:  Mark G. Barberio
      Telecopy: (716) 689 6098

      and

7

Dayco Products, LLC
1 Prestige Place
Miamisburg, Ohio 45342
Attention:     Karen Rogers
Telecopy: (937) 226 5753

with a copy to (which shall not constitute notice to Providers):

Skadden, Arps, Slate, Meagher & Flom, LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Attn:   J. Eric Ivester
        Stephen D. Williamson
Telecopy: (312) 407 0411; and

(ii)     if to Recipient,

Fluid Routing Solutions, Inc.
1935 Enterprise Drive
Rochester Hills, Michigan  48309
Attn:   John C. Carson
Telecopy: (248) 299 1490

with a copy to (which shall not constitute notice to Recipient):

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178
Attn:   Neil E. Herman
Telecopy: (212) 309 6001

and

Morgan, Lewis & Bockius LLP
One Oxford Centre, 32nd Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219
Attn:   David A. Gerson
Telecopy: (412) 560 7001

18.     Interpretation; Exhibits. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.     Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The word "or" shall not be deemed exclusive unless the context requires otherwise. The words "hereof", "herein", "hereby" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

8

The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. All Exhibits attached hereto are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. When a reference is made in this Agreement to a Section or Exhibit, such reference shall be to a Section of, or an Exhibit to, this Agreement unless otherwise indicated.

19. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Parties.

20. <u>Entire Agreement</u>. This Agreement, the Settlement Agreement and the agreements and documents described in and attached as exhibits to the Settlement Agreement, contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings between the Parties relating to such subject matter. No Party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein, in the Settlement Agreement or in the agreements and documents described in and attached as exhibits to the Settlement Agreement. In the event of any conflict between the provisions of this Agreement (including the Exhibits hereto), on the one hand, and the provisions of the Settlement Agreement, on the other hand, the Settlement Agreement shall control.

21. <u>Severability</u>. If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

22. <u>Governing Law</u>. THE LAW OF THE STATE OF NEW YORK, TO THE EXTENT JUSTICIABLE THEREUNDER, SHALL GOVERN ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, INTERPRETATION AND ENFORCEABILITY OF THIS AGREEMENT AND THE EXHIBITS ATTACHED HERETO, AND THE PERFORMANCE OF THE OBLIGATIONS IMPOSED BY THIS AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

23.    Dispute Resolution.

(a)    Any controversy, claim or dispute between the Parties arising out of or relating to a provision of this Agreement or the breach, termination or a validity thereof shall, upon written request of either Party, immediately be referred jointly for resolution to senior executives of each of the Parties who have authority to settle the controversy and who are at a higher level of management than the person(s) with direct responsibility for day-to-day administration of this Agreement.  The written request shall set forth the details of the claim. Within fifteen (15) days after delivery of the written request of a Party, the receiving Party shall submit to the other a written response.  The request notice and the response shall each include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of any other person who will accompany the senior executive. Within thirty (30) days after delivery of the disputing Party's request notice, the senior executives of both Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt in good faith to resolve the controversy. The Parties agree to honor all reasonable requests for information. All negotiations pursuant to this provision shall be confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

(b)    If any such controversy, claim or dispute has not been resolved by negotiation within forty-five (45) days of the disputing Party's request notice, or if the Parties failed to meet within thirty (30) days of such request notice, then each of the Parties agrees that such controversy, claim or dispute shall be finally and completely settled without appeal by arbitration in New York, New York under the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") in effect as of the date of the request for arbitration, which rules are deemed to be incorporated into this Section 23(b); provided, however, that in the event of any conflict between such rules and the other provisions of this Agreement, such other provisions of this Agreement shall control.  The arbitration shall be conducted before a panel of three (3) arbitrators.  Each Party shall appoint one (1) arbitrator within thirty (30) days of receiving notice of the request for arbitration in accordance with the Commercial Arbitration Rules of the AAA.  The two Party appointed arbitrators shall then attempt to appoint a third arbitrator who shall act as the chairman of the panel (the "Chairman") within twenty (20) days of the appointment of the second arbitrator.  If the Party-appointed arbitrators fail to agree on the Chairman within such period, the Chairman shall be appointed by the AAA upon the written request of either Party.  Each Party shall be entitled to reasonable discovery rights, and issues as to discovery shall be determined by the arbitral panel applying the laws of the State of New York as provided in Section 22.  The decision of the arbitrators shall be by majority vote, shall be in writing, shall set forth the facts found by the arbitrators to exist, their decision and the basis for that decision and shall be final and binding upon the Parties and not subject to appeal, and the judgment of any court of competent jurisdiction may be entered thereon.  Except to the extent permitted by the express terms of this Agreement, the arbitral panel shall not have the authority to award any consequential, punitive, special, exemplary or incidental damages.  The arbitrators shall award the costs and expenses of the arbitration, including reasonable attorneys' fees, disbursements, arbitration expense, arbitrators' fees and the administrative fee of the AAA, to the prevailing Party as shall be determined by the arbitrators.

10

(c)     Notwithstanding anything to the contrary in this Agreement, no provision of this Agreement shall prohibit Recipient from seeking equitable relief, including, without limitation, for a Provider's specific performance of this Agreement, in any court of law or equity.

24.     WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT, OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

25.     Amendments and Waivers. This Agreement may not be amended, modified, superseded or cancelled except by an instrument in writing signed on behalf of each Party hereto. By an instrument in writing, either Party may waive compliance by the other Party with any term or provision of this Agreement that such other Party was obligated to comply with or perform. No delay or omission by either Party to exercise any right or power under this Agreement or pursuant to applicable law shall impair such right or power or be construed as a waiver thereof. A waiver by a Party of any of the covenants to be performed by the other Party or any breach shall not be construed to be a waiver of any succeeding breach or of any other covenant. The failure by any Party to enforce any term of this Agreement shall not be deemed to be a waiver of future enforcement of that or any other term of this Agreement.

26.     Survival. The provisions of Sections 4, 5, 7(b), 9, 13, 17, 22-24 and 26 shall survive the expiration or earlier termination of this Agreement for any reason whatsoever.

* * *

11

IN WITNESS WHEREOF, the Recipient and the Providers have duly executed this Agreement as of the date first written above.

RECIPIENT:

**Fluid Routing Solutions, Inc.**

_____

By:  John C. Carson
Its:  Chief Financial Officer

PROVIDERS:

**Mark IV Industries, Inc.**

_____

By:  Mark G. Barberio
Its:  Chief Financial Officer

**Dayco Products, LLC**

_____

By:  Mark G. Barberio
Its:  Chief Financial Officer

**EXHIBIT A**

**Services**

## 1. Hardware Support

The business application hardware is IBM AS400. Remote access shall be provided. A list of the relevant hardware is attached hereto as Attachment 1

All production equipment is currently covered by hardware maintenance.

## 2. Technical Services

Data Operations — Routine execution of system schedules, management of backup media, help desk support after hours and holidays. Available 24 by 7. This service is outsourced to Analyst International Group located in Auburn Hills, Michigan.

WAN Management — First responder to all network issues, router upgrade and maintenance,

Disaster Recovery — Annual testing of recovery plan.

AS400 Support Services (Production and Test) — Application of IBM PTF's (Program Temporary Fix), system tuning, performance monitoring and printer and external websites. Firewall Support Monitoring and managing firewall systems to prevent unauthorized network entry.

## 3. AS400 Software Support

AS400 Legacy Software Support – Design and development of new system or modification of existing systems as required by the end user.

COIN (Customer Order Entry, Sales and Finished Goods Inventory)
EDI (Electronic Data Interchange)
Financials (Accounts Receivable, Accounts Payable, General Ledger, Fixed Assets)
MRP and Shop Floor Control Engineering

AS400 Purchased Software Support – Application of updates provided by software vendor and made available by Providers, creation of unique reporting as defined by Recipient, including, without limitation:

Kronos — Time and Attendance
Cognos — Data warehousing
Gentran — EDI Translation
Infinium Payroll and Benefits Processing Support

AS400 Operating Software Support Application of vendor provided upgrades and system keys made available by Providers, including, without limitation:

IBM Software Subscriptions
Help Systems Products
    *Robot Scheduler*
    *Robot Client*
    *Robot Reports*
Broderick
TL Ashford
Aldon
Pro Data
Hawkeye Pathfinder
TAA Tools

## 4. Help Desk/Training and Education

Phone support and online support for Recipient reporting of system issues or questions during standard business hours. Outsourced service for after hours and holidays.

14

Training and Education means assistance with Recipient's new system implementation and creation of documentation for all of Recipient's new systems or modifications

## 5. Information Systems Management

Provide overall Information Services guidance and direction necessary to maintain current level of operating stability and adherence to industry accepted guidelines for accountability.

## 6. Telecommunications

All telecommunication administration, including, without limitation:

WAN – Data access, Internet access and related services.

Voice – Provide long distance telephone access and services,

Cellular – Provide cellular service access and services,

ANX – Provide access to Automotive Network Exchange.

I Connect   Supplier and customer EDI communications portal.

Note: Capital equipment and software rights noted above will be maintained or replaced by the Providers as necessary at no additional cost to the Recipient (Attachment 1 hereto identifies the equipment utilized as of the date of this Agreement)

# Attachment 1 to EXHIBIT A  Shared Hardware

**Auburn Hills, Michigan Data Center**
IBM 3590 E11 Tape (Dual 1 of 2)
IBM 3590 E11 Tape (Dual 2 of 2)
IBM 3590 E11
IBM 810 2465
IBM 825 2473
Dell PIII 1Ghz 1.5Gb RAM 70GB HDD:Netflow
Dell P4 2.4Ghz 256Mb RAM 40Gb HDD:Bkup DNS
HP PIII800Mhz 2.5Gb RAM 8Gb HDD:SMTP Gate
Dell Xeon 2.8Ghz 1.5Gb RAM 70Gb HDD:WebMail
Cisco ASA 5520 VPN Concentrator
Cisco ASA 5510 Firewall


**Rochester Hills, Michigan**
Dell PIII 733Mhz 768Mb RAM 18Gb HDD
Dell Ppro 200Mhz 256Mb RAM 40Gb HDD
Dell Xeon 2.8Ghz 3.8Gb RAM 370Gb HDD
Dell PIII850Mhz 1Gb RAM 60Gb HDD
Dell PII 350Mhz 256Mb RAM 18Gb HDD
Dell PIII 700Mhz 1Gb RAM 340Gb HDD
Dell PIII 1Ghz 2.5Gb RAM 100Gb HDD
Dell PIII300Mhz 512Mb RAM 27Gb HDD
Dell Xeon 1.9Ghz 3.5Gb RAM 550Gb HDD
Dell PIII 600Mhz 2.5Gb RAM 60Gb HDD
Dell Xeon 2.8Ghz 3Gb RAM 70Gb HDD

# EXHIBIT B

## <u>Representatives</u>

For Providers:

       Mark G. Barberio

       Karen Rogers

For Recipients:

       John C. Carson

## Amended and Restated Supply Agreement

DB1/62710454.2

## AMENDED AND RESTATED SUPPLY AGREEMENT

This AMENDED AND RESTATED SUPPLY AGREEMENT (this "Amended Agreement"), dated as of March 23, 2009, is entered into by and among FLUID ROUTING SOLUTIONS, INC. ("FRS Inc." or the "Debtor"), a debtor and debtor-in-possession in chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under Case No. 09-10384 (CSS) (Jointly Administered), MARK IV INDUSTRIES, INC., a Delaware corporation ("Mark IV"), DAYCO PRODUCTS, LLC, a Delaware limited liability company ("Dayco" and together with Mark IV, the "Purchasers" and individually each a "Purchaser"), and FRS HOLDING CORP., a Delaware corporation ("FRS Holding" or the "Supplier"), the proposed purchaser of certain of the Debtors' assets and business operations. This Agreement shall become effective only upon the occurrence of the Effective Date defined in that certain Settlement Agreement and Release, dated March 23, 2009, among the Debtor, certain of its debtor affiliates in the Chapter 11 Cases, the Purchasers and the Supplier (the "Settlement Agreement"). Until the earlier of the Effective Date or the termination date of the Initial Agreement, the Initial Agreement shall remain in full force and effect. Each of the Debtor, Purchasers, and the Supplier is hereinafter referred to individually as a "Party" and together as the "Parties."

WHEREAS, pursuant that certain Purchase Agreement dated as of May 25, 2007 (the "2007 Purchase Agreement"), among the Mark IV, Dayco, Dayco Fluid Technologies Corp. ("DFTC"), FRS Inc., and Fluid Routing Solutions Canada Corp. ("FRS Canada"), Mark IV sold all of the capital stock of Mark IV Automotive, LLC (now know as Fluid Routing Solutions Automotive, LLC) to FRS Inc., and Dayco and DFTC sold certain of their assets to FRS Inc. and FRS Canada; and

WHEREAS, pursuant to that certain Supply Agreement (the "Initial Agreement"), dated as of May 25, 2007, among the Debtor and the Purchaser, the Debtor manufactures the products listed on Schedule A hereto as more precisely itemized and described in Schedule B hereto (collectively, the "Products") at its facilities; and

WHEREAS, on February 6, 2009 (the "Petition Date"), the Debtor and certain of its affiliates (collectively, the "Debtors") commenced the Chapter 11 Cases and immediately filed a motion (the "Sale and Bid Procedures Motion") seeking a Bankruptcy Court order (the "Proposed Sale Order") approving, and authorizing the Debtors to enter into and consummate, that certain Asset Purchase Agreement, dated as of February 6, 2009, among FRS Holding, and the Debtors (the "Proposed Purchase Agreement"), pursuant to which the Debtors would sell (the "Proposed Sale") to FRS Holding substantially all of the Debtors' assets relating to their hose extrusion operations, fuel hose assembly and power steering service businesses, including their respective activities relating to the development, manufacture, assembly, distribution, service and sale of fuel filler assembly, power steering service assembly and hose extrusion products, including without limitation, the Debtors' service operations located in their Big Rapids, Michigan facility (as defined in the Proposed Purchase Agreement, the "Business"); and

WHEREAS, in the event that the Bankruptcy Court approves the Proposed Sale pursuant to the Proposed Purchase Agreement and the Proposed Sale is closed, the Purchasers desire a source of supply of Products from the Supplier, and the Supplier desires and is willing supply to the Purchasers such Products, in accordance with the terms and conditions hereinafter set forth; and

WHEREAS, upon the occurrence of the Effective Date, this Amended Agreement shall amend and restate the Initial Agreement in its entirety and the Purchasers shall have no further obligations under the Initial Agreement; and

WHEREAS, upon the occurrence of the Effective Date, this Amended Agreement automatically shall be, and shall be deemed to be, assumed by the Debtor and assigned to the Supplier pursuant to the terms of the Settlement Agreement.

WHEREAS, the execution and the delivery of this Amended Agreement are contemplated by the Settlement Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree as follows.

1.    Certain Definitions. Capitalized terms that are not otherwise defined in this Amended Agreement shall have the meanings ascribed to them in the 2007 Purchase Agreement. For purposes of this Amended Agreement, the following terms shall have the following meanings:

(a)    "30R7 Formulations" means the composition of materials used in the manufacture of standard fuel hose existing as of the Effective Date, together with, any and all information related to its manufacture insofar as that information is available in the formulation database as of the Effective Date, including, without limitation, specific quantities or proportions of those materials, mixing conditions and processing procedures including order of addition of materials, target properties, and quality control procedures.

(b)    "30R7 Product" means any product made in whole or in part according to the 30R7 Formulations.

(c)    "Bankruptcy Event" means any of the following events or circumstances: (i) a Party makes a general assignment for the benefit of its creditors; (ii) a Party petitions, applies for, or suffers or permits with or without its consent, the appointment of a custodian, receiver, trustee in bankruptcy or similar officer for all or any substantial part of its business or assets; or (iii) a Party becomes subject to any bankruptcy, insolvency, reorganization,

2

receivership, arrangement, moratorium, debt adjustment, dissolution or liquidation proceeding or avails itself of any state, federal or foreign statute relating to bankruptcy, insolvency, reorganization, receivership, arrangement, moratorium, adjustment of debts, dissolution or liquidation, or any non-U.S. substantial equivalent of such a proceeding (whether or not having the same legal consequences), which proceeding is not dismissed within sixty (60) days of commencement thereof.

(d)     "Radiator Hose Products" shall mean those Products identified as such with an asterisk on Schedule A.

2.     Sale and Purchase; Exclusivity.

(a)     The Supplier shall supply to the Purchasers, and the Purchasers shall purchase from the Supplier, the Products listed in Schedule A hereto, more precisely itemized and described in Schedule B hereto. The Products supplied under this Amended Agreement may be changed by mutual agreement of the Parties. Promptly after the Parties agree to any change to the Products supplied under this Amended Agreement, the Parties shall amend Schedule A and/or Schedule B to reflect such change.

(b)     During the Term of this Amended Agreement, the Purchasers shall purchase exclusively from the Supplier Products in such quantities as are necessary to satisfy the Purchasers' total annual needs for such Products, except for such Products designated as "Dual Source" in Schedule B hereto (such Products, "Dual Sourced Parts"). The Supplier shall supply to the Purchasers, and the Purchasers shall purchase from the Supplier, approximately 50% of Purchasers' total semi-annual needs for Dual Sourced Parts.

3.     Term.

(a)     This Amended Agreement shall commence on the Effective Date and shall continue in force for a term of six (6) months (the "Term"). The Term of this Amended Agreement may be renewed or extended solely by mutual written agreement of the Parties.

(b)     Notwithstanding the foregoing, immediately upon the expiration or termination of this Amended Agreement for any reason (except for termination by the Supplier pursuant to Section 13(c), the Purchasers, at their sole discretion, may elect to extend this Amended Agreement as it relates to 30R7 Products for the earlier of (i) one (1) year, or (ii) the date upon which the Purchasers re-source 30R7 Products, or reasonable replacements for such products, from another supplier; provided that the Purchasers shall use commercially reasonable efforts to re-source the 30R7 Products as soon as reasonably practicable under the circumstances.

3

4. <u>Purchase Prices</u>. The prices (the "<u>Purchase Prices</u>") for the Products purchased hereto during the Term shall be as follows:

(a) For all Products ordered the Purchase Prices shall be as set forth in <u>Schedule B</u> hereto.

(b) For all new Products added to the Amended Agreement pursuant to <u>Section 2(a)</u>, the Supplier shall furnish a quote with a breakdown of cost to the Purchasers and the Purchase Price shall be in accordance with the methodology used for pricing the products in <u>Schedule B</u>.

(c) All prices are in U.S. Dollars and are exclusive of any applicable taxes.

5. <u>Orders</u>.

(a) <u>Purchase Orders</u>.

(i) Purchasers shall provide a six (6) month purchase plan on the Effective Date and update such plan by the 10th working day of each month, with volumes aggregated to product families that are mutually agreed upon by the Parties in relation to manufacturing capacity groups (the "<u>SOP Plan</u>"). The Purchasers shall use commercially reasonable efforts to avoid updates or changes to the SOP Plan within two (2) months of the delivery date of Products specified therein. Supplier shall reserve and secure manufacturing capacity based upon the latest SOP Plan.

(ii) The Purchasers shall issue to the Supplier weekly purchase orders ("<u>Purchase Orders</u>") that will designate part numbers, quantities and shipping location.

(iii) The Purchasers may contact and negotiate additional product builds/reductions with the Supplier if needed. The Purchasers may also contact the Supplier with expedites/de-expedites if unusual demands occur. Shipping schedules will be negotiated in such circumstances between the Purchasers and the Supplier. Product lead times will be supplied to the Purchasers from time to time and future Purchase Orders shall be placed in compliance therewith.

(iv) Each Purchase Order shall be governed by, and is hereby deemed to incorporate by reference, the terms and conditions of this Amended Agreement and the Schedules and Exhibits attached hereto. Any inconsistency, ambiguity or conflict between the Purchase Order, this Amended Agreement, and the Schedules and Exhibits attached hereto shall

4

be resolved in the following order of precedence (with (i) having the highest precedence): (i) this Amended Agreement; (ii) Schedules and Exhibits; and (iii) Purchase Order.

(v)     The Supplier shall notify the Purchasers as soon as reasonably practicable in advance of any plant closings by the Supplier, but in no event any later than two (2) business days after Supplier makes a definitive decision to close any plant; provided that the Purchasers shall not disclose to any third party information provided by the Supplier with respect to a plant closing until and unless such information becomes publicly available from a source other than the Purchasers.

(b)     EDI Electronic Data Interchange.     The Supplier shall support the Purchasers in Electronic Data Interchange (EDI) as outlined on Exhibit 1.

(c)     Supplier Guidelines.     The Supplier agrees to adhere to the Supplier Guidelines as outlined on Exhibit 2.

(d)     Traffic Guidelines.     The Supplier agrees to adhere to the Traffic Guidelines as outlined on Exhibit 3.

(e)     Packaging Guidelines.     The Supplier agrees to adhere in all material respects to the Packaging Guidelines as outlined on Exhibit 2.

6.     Formulations.

(a)     If the Purchasers determine that it is necessary or desirable to change the formulation for any Product, they shall provide written notice to the Supplier requesting such change and the Supplier shall implement such change as soon as commercially practicable and subject to the Supplier's reasonable consent, such consent not to be unreasonably withheld, provided, that the Supplier shall have no obligation to implement any change to formulations that would result in a violation of any legal or regulatory requirement.

(b)     The Supplier shall transfer all formulations for Radiator Hose Products to the Purchasers as requested by the Purchasers or, if not theretofore requested by the Purchasers, upon the termination or expiration of this Amended Agreement.

(c)     If the Purchasers terminate this Amended Agreement pursuant to Section 13(c)(i), then: (i) the Supplier shall immediately disclose the formulation (that exists as of the Effective Date) for the 30R7 Products to an unaffiliated, bona fide subcontractor of the Purchasers; and (ii) such subcontractor shall be entitled, pursuant to an agreement identified in

Section 6(d) below, to use such formulation solely for the purpose of meeting the Purchasers', and not any third parties, requirements of the 30R7 Products.

(d)     The terms and conditions of such transfers and disclosures under Sections 6(b) and (c) shall be as mutually agreed by the parties to such transfers or disclosures, as the case may be. The parties to such transfers or disclosures, as the case may be, shall execute mutually acceptable confidentiality and trade secret agreements negotiated in good faith and on commercially reasonable terms. Notwithstanding anything to the contrary in this Amended Agreement, (i) the Supplier shall own the rights, including the intangible rights, in the formulations for Products other than Radiator Hose Products (including the 30R7 Products) and (ii) the Purchasers shall own the rights, including the intangible rights, in the formulations for Radiator Hose Products.

(e)     If the Supplier determines that it is necessary or desirable to change the formulation for any Product, the Supplier shall provide the Purchasers with written notice of any material changes or modifications to the specifications it wishes to make. Purchasers will respond with their approval or disapproval of such changes or modifications within five (5) business days after receiving written notice of the proposed changes or modifications from the Supplier. Supplier shall not implement any such changes or modifications without Purchasers' approval.

7.     Payment Terms. Subject to Section 27, Purchasers shall pay to Supplier the Purchase Prices for quantities of Products ordered pursuant to Purchase Orders in advance of or at delivery.

8.     Risk of Loss; Title; Delivery; Invoices.

(a)     All deliveries of Products from the Supplier's facilities (i) inside the continental United States shall be shipped F.O.B. Supplier's applicable facility and (ii) outside the continental United States shall be shipped F.O.B. a landed facility in the continental United States (each, a "Shipment Point"). Title to, and risk of loss associated with, the Products shall pass to the Purchasers upon shipment from the Shipment Point.

(b)     The Supplier shall, at the Purchasers' expense, ship Products directly to the Purchasers' facilit(ies) identified in the Purchase Order(s) applicable to such Products. Notwithstanding the foregoing sentence, any Products designated in Schedule B hereto as "Drop Ship" Products shall be delivered by Supplier directly to Purchasers' customers at Purchasers' expense and in accordance with shipment instructions provided by Purchasers.

(c)     In the event that a delivery of Products by the Supplier would occur later than a date required by a Purchase Order and is not the direct result of (i) a force majeure event

6

or (ii) the Purchasers' breach of this Amended Agreement, the Supplier shall ship Products using premium freight techniques identified by the Purchasers at the expense of Supplier.

(d)     The Supplier shall invoice the Purchasers on a per-shipment basis.

9.      Warranty.

(a)     The Supplier warrants that the Products shall be free of defects in material and workmanship. The Supplier shall use commercially reasonable efforts to comply with all applicable governmental laws, regulations, ordinances, standards, order and decrees relating to pollution, ecology and environmental matters.

(b)     The Supplier warrants that any modifications by the Supplier (and not at the request of the Purchasers) of specifications and formulations of the Products shall not infringe or otherwise conflict with any intellectual property rights of third parties.

(c)     SUBSECTIONS (a) AND (b) ABOVE SET FORTH THE SUPPLIER'S SOLE WARRANTY RESPECTING THE PRODUCTS INCLUDING PRODUCT QUALITY AND PERFORMANCE. THE SUPPLIER MAKES NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR ANY PURPOSE, AND NO OTHER EXPRESS OR IMPLIED REPRESENTATION, WARRANTY OR COVENANT WITH RESPECT TO ANY PRODUCT. EXCEPT AS PROVIDED HEREIN, THE PURCHASERS ASSUME ALL RISKS AND LIABILITIES RESULTING FROM THE USE OF THE PRODUCTS DELIVERED HEREUNDER. THE PROVISIONS OF THIS SECTION 9(c) SHALL SURVIVE ANY EXPIRATION, CANCELLATION OR OTHER TERMINATION OF THIS AMENDED AGREEMENT.

(d)     The Purchasers warrant that, solely in connection with sales of Products to the Purchasers under this Amended Agreement, (i) the Radiator Hose Products (and their specifications and formulations), and (ii) modifications by the Purchasers of the Products (and their specifications and formulations) shall not infringe or otherwise conflict with any intellectual property rights of third parties.

10.     Notice of Claims: Replacement. Within thirty (30) days following their receipt of written notice thereof, the Purchasers shall notify the Supplier of any claim that a Product is defective in material and/or workmanship. Within thirty (30) days following notification pursuant to the foregoing sentence, the Purchasers shall permit the Supplier to elect to either inspect such Product at the Purchasers' facility or have the Product returned to the Supplier. The Supplier shall have no obligation for defective Products if such defect is a result of a Product exceeding its shelf life, or of improper storage, contamination or adulteration after shipment thereof to the Purchasers. The Supplier, at its reasonable election, shall rework or replace any

7

defective Products at the Supplier's expense. The Supplier shall additionally reimburse the Purchasers for any reasonable out-of-pocket expenses arising out of sorting or segregating reworked or replacement Products. The Purchasers shall have the right to approve the Supplier's choice of inspector and inspection expenses for the sorting and segregating replacement of the Products, such approval not to be unreasonably withheld. The Purchasers' rights under this Section 10 with respect to each Product shall last for three (3) years from the date of shipment of such Product to Purchasers from the Shipment Point.

11.     Tooling. Certain tooling (the "Tooling") owned by the Purchasers has been provided to the Supplier by the Purchasers and is utilized by the Supplier to manufacture the Products. Such Tooling shall be utilized by the Supplier solely to manufacture Products for the Purchasers in accordance with this Amended Agreement. The Tooling shall be stored at the Supplier's facility, provided nothing in this Amended Agreement shall prohibit the Supplier from moving the Tooling to another facility owned or controlled by the Supplier upon prior written notice to the Purchasers. The Supplier shall bear the risk of loss with respect to the Tooling and shall: (a) store the Tooling so as to maintain it in good working condition; (b) inventory the Tooling; (c) return the Tooling to the Purchasers upon the Purchasers' request; (d) provide routine maintenance for the Tooling and (e) notify the Purchasers in the event major maintenance or replacement through the ordinary course of production with respect to the Tooling is required. Upon reasonable notice from the Purchasers, during the Term, the Supplier shall make its facility available to the Purchasers during regular business hours for inspection of the Tooling; provided that the Purchasers shall conduct no more than one (1) such inspection per calendar year. Notwithstanding the foregoing, the Purchasers shall be responsible for major maintenance or replacement with respect to the Tooling as a result of the ordinary course of production so long as such maintenance or replacement is not required as a result of the Supplier's negligence, in which case the Supplier shall be responsible for such major maintenance or replacement.

12.     Unfilled Orders. In the event that the Supplier does not deliver Products to the Purchasers in accordance with a Purchase Order delivered to the Supplier in accordance with this Amended Agreement (any such Purchase Order, an "Unfilled Order"), the Purchasers shall notify the Supplier in writing of such failure. In the event that the Supplier does not, within two (2) weeks after receipt of such written notice, either (a) supply to the Purchasers the Products ordered pursuant to the Unfilled Order or (b) develop a plan to deliver the Products that were ordered pursuant to the Unfilled Order that is acceptable to the Purchasers, then, notwithstanding Section 2(b) hereof, the Purchasers shall be permitted to purchase Products manufactured and supplied by any other person, and the Supplier shall reimburse the Purchasers for the Purchaser's cost of cover in excess of the amount that would have been paid for applicable Product under such Unfilled Order and shipping expenses; provided, that the Supplier shall not reimburse the Purchasers if the Unfilled Orders resulted directly from (i) a force majeure event, or (ii) the Purchasers' breach of this Amended Agreement. The Purchasers agree to act in a commercially reasonable manner to mitigate the effects of any purchase from another supplier pursuant to this Section 12.

13.     Termination.

8

(a)     This Amended Agreement may be terminated at any time upon mutual consent of the Parties, evidenced by a written document signed by an authorized officer or representative of each Party.

(b)     Any of the Parties may terminate this Amended Agreement at any time prior to the Effective Date upon written notice to the other Parties if:

(i)     any other Party breaches any of the material terms or conditions of this Amended Agreement and fails to cure such breach within thirty (30) days of its receipt of written notice thereof; or

(ii)     a Bankruptcy Event occurs with respect to any Party other than the Debtor.

(c)     From and after the Effective Date, the Supplier or the Purchasers may terminate this Amended Agreement at any time upon written notice to the Purchasers or the Supplier, respectively, if:

(i)     the other Party breaches any of the material terms or conditions of this Amended Agreement and fails to cure such breach within thirty (30) days of its receipt of written notice thereof;

(ii)     a Bankruptcy Event occurs with respect to the other Party; or

(iii)     in the event that performance of this Amended Agreement by the other Party shall have been rendered impossible or impractical for a period of two (2) months by reason of the happening of one or more events of force majeure described in Section 19.

(d)     Upon termination of this Amended Agreement by a Party pursuant to Section 13(c) above, (i) any payment due hereunder shall immediately become due and (ii) the Purchasers shall purchase from the Supplier, at or prior to the time such termination becomes effective, all completed Products ordered by the Purchasers and packaged and ready for shipment, together with all raw material and product components, if any, which the Supplier shall have produced or be obligated to receive as a result of or in reliance upon all open Purchase Orders of the Purchasers, less any raw materials, parts and product components which are useable to the Supplier in its continuing manufacturing operations.

(e)     In the event of the sale, directly or indirectly, of a controlling interest of the Supplier, such that more than 35% of the voting stock of the Supplier is owned or controlled directly or indirectly by another entity or corporation or all or substantially all of the assets of the

9

Supplier are sold to a non-affiliate third party, Supplier shall provide prompt notice in writing to the Purchasers; provided the Purchasers' consent shall not be required.

14. Proprietary Rights.

(a) The Supplier and the Purchasers hereby agree that information they may acquire from each other in connection with this Amended Agreement concerning Products, manufacturing equipment or processes, customers or distributions methods, as well as the terms of this Amended Agreement, ("Confidential Information") shall not be disclosed to third parties except as such information (i) was in the public domain at the time of disclosure by one Party to the other; (ii) enters the public domain through no fault of the Parties hereto; (iii) was communicated after the date hereof to one of the Parties by a third party free of any obligation or confidence known to the receiving Party; (iv) was developed by officers, employees or agents of or consultants to one of the Parties independently of and without reference to the proprietary information of the other Party after the Effective Date; (v) is required to be disclosed to attorneys of litigants or to governmental authorities to comply with any obligation imposed on one or both of the Parties in connection with a proceeding in a court or other governmental authority of competent jurisdiction, provided that the disclosing Party gives reasonably prompt notice to the nondisclosing Party of the need for such disclosure, together with such other information about the proceeding as will enable the non-disclosing Party to evaluate the obligation and the need to elect either to intervene or otherwise appear or act in the proceeding to protect directly the information at the expense of the non-disclosing Party, or instead to request the disclosing Party to, and if so requested, the disclosing Party shall, make a reasonable and diligent effort at the expense of the non-disclosing Party to obtain a protective order or otherwise to protect the confidentiality of information sought to be obtained in said proceeding. Each Party shall protect the confidentiality of Confidential Information through the exercise of at least that degree of care that it uses in preserving and safeguarding its own Confidential Information, but in no event less than a reasonable degree of care. Each Party shall, upon expiration or termination of this Amended Agreement, or otherwise upon demand, at the other Party's option, return to the other Party and certify in writing to other Party the return of any and all documents, papers and materials and notes thereon in each Party's possession, including copies or reproductions thereof, to the extent they contain Confidential Information.

(b) Nothing contained in this Amended Agreement shall restrict any Party from the use of any general information, technology, ideas, concepts, know-how and techniques relating to any Products that such Party, individually or jointly, develops, receives or discloses under the Amended Agreement, provided that in doing so, such party does not breach its obligations under this Section 14.

15. Limitation of Liability. The Purchasers' exclusive remedy and the Supplier's total liability to the Purchasers for claims arising from the Supplier's nonconformance with its commitment set forth in Section 9(a) hereof is limited to the provisions set forth in Section 10 hereof. Under no circumstances shall any Party be liable to the other Party under any legal theory for any indirect, incidental, special, consequential or punitive damages, including lost

10

profits, arising in connection with this Amended Agreement; provided, the limitations set forth in this Section 15 shall not apply to liabilities arising or resulting from gross negligence, willful misconduct, intentional breach, fraud, violation of intellectual property rights, violation of laws, or any Parties' indemnification obligation under Section 18.

16.     Insurance. The Supplier shall procure reasonably adequate insurance for product liability damages arising out of the sale or use of the Products. Each Party shall maintain comprehensive general liability insurance, on an occurrence basis, for injury to or death of any person(s) or damage to property of not less than $1,000,000 per occurrence single limit policy. The Supplier shall supply the Purchasers with certificates of such comprehensive general liability insurance and specify the Purchasers as additional insureds thereunder, as its interest may appear, before the earlier of (a) sixty (60) days from the execution of this Amended Agreement and (b) the first delivery of Product to the delivery point hereunder. Such certificate shall provide that such insurance shall not be canceled, terminated or modified unless ninety (90) days' prior notice is given to the Purchasers.

17.     Subcontracting. The Supplier may not subcontract or delegate any portion of its obligations, duties or responsibilities under this Amended Agreement without the prior written consent of the Purchasers, which consent shall not be unreasonably withheld; provided, however, that the Supplier may subcontract or delegate its obligations, duties or responsibilities with respect to (i) raw materials and supplies, including, without limitation, sleeves, connectors and hangers, and (ii) components, parts and processes in the same manner as prior to the Effective Date; provided further that the Supplier shall retain responsibility for the acts or omissions of all of the Supplier's employees, agents, subcontractors and suppliers. Subject to the limitations of liability under Section 15, the Supplier shall be responsible for all payments to, and claims by, the Supplier's employees, agents and contractors relating to performance or nonperformance under this Amended Agreement, and the Supplier shall ensure the Supplier's employees, agents and contractors comply with the provisions of this Amended Agreement where relevant. Notwithstanding anything contained in this Section 17 to the contrary, the Supplier may subcontract or delegate its obligations, duties or responsibilities with respect to raw materials, components, parts, process and supplies to Affiliates (as defined below) or wholly-owned subsidiaries of the Supplier. For purposes of this Section 17, "Affiliate" shall mean an entity that controls, is controlled by, or is under common control with the Supplier.

18.     Indemnification.

(a)     The Supplier shall indemnify and hold harmless the Purchasers and their respective officers, directors, agent, employees and representatives from and against all third party claims, losses, damages and liabilities, including reasonable legal fees and costs, arising out of or relating to (i) any failure of Products to conform to meet the standards set forth in Section 9(a) hereof and (ii) any third party liabilities relating to the Products that are directly attributable to the gross negligence or willful misconduct of the Supplier; provided, that such third party claims are not the result of the Purchasers' breach of this Amended Agreement.

11

(b)     The Purchasers shall indemnify and hold harmless the Supplier and its officers, directors, agents, employees and representatives from and against all third party claims, losses, damages and liabilities, including reasonable legal fees and costs, arising out of or relating to any liabilities relating to the Products; provided, that such third party claims are not subject to indemnification by the Supplier under Section 18(a).

(c)     If an indemnified party receives written notice of the commencement of any action or proceeding, the assertion of any claim by a third party for which indemnity may be sought under this Section 18 (a "Third Party Claim") and the indemnified party intends to seeks indemnity pursuant to this Section 18, the indemnified party shall promptly provide the indemnifying party with written notice of such Third Party Claim. The indemnifying party shall be entitled to participate in or, at its option, assume the defense, appeal or settlement of such Third Party Claim. If the indemnifying party assumes the defense, appeal or settlement of such Third Party Claim, such defense, appeal or settlement shall be conducted through counsel selected by the indemnifying party and the indemnified party shall fully cooperate with the indemnifying party in connection therewith.

19.     Force Majeure.  No Party shall be liable for any delay in manufacture, delivery, acceptance or performance under this Amended Agreement caused by fire, flood, explosion, earthquake, storm, war, riot, insurrection, act of God, embargo, appropriation of plant or product by governmental regulations, other prohibition or restriction by governmental action or regulation, strike or other similar labor disturbance, accident or by any other circumstances beyond the reasonable control of such Party; provided, however, that the Party experiencing such event of force majeure shall take whatever action is commercially reasonable to eliminate such event of force majeure.

20.     Independent Contractor Relationship.   At all times during the Term of this Amended Agreement, the relationship between the Parties is that of independent contractors and no Party nor its affiliates, agents, or employees, shall be deemed to be the representative of any other Party.  No Party shall have the right to bind any other Party to any agreement or to incur any liability for or on behalf of any other Party.  Nothing in this Amended Agreement shall be construed or interpreted to create a relationship between the Parties of partner, joint venturer, principal and agent, or employer and employee.

21.     Governing Law.  THE LAW OF THE STATE OF NEW YORK TO THE EXTENT JUSTICIABLE THEREUNDER, SHALL GOVERN ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, INTERPRETATION AND ENFORCEABILITY OF THIS AMENDED AGREEMENT AND THE SCHEDULES ATTACHED HERETO, AND THE PERFORMANCE OF THE OBLIGATIONS IMPOSED BY THIS AMENDED AGREEMENT, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

22. Dispute Resolution.

(a) Any controversy, claim or dispute between the Parties arising out of or relating to a provision of this Amended Agreement or the breach, termination or validity thereof shall, upon written request of any Party, immediately be referred jointly for resolution to senior executives of each Party who have authority to settle the controversy and who are at a higher level of management than the person(s) with direct responsibility for day-to-day administration of this Amended Agreement. The written request shall set forth the details of the claim. Within fifteen (15) days after delivery of the written request of a Party, the receiving Party shall submit to the other(s) a written response. The request notice and the response shall each include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of any other person who will accompany the senior executive. Within thirty (30) days after delivery of the disputing Party's request notice, the senior executives of each Party shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt in good faith to resolve the controversy. The Parties agree to honor all reasonable requests for information. All negotiations pursuant to this provision shall be confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

(b) If any such controversy, claim or dispute has not been resolved by negotiation within forty-five (45) days of the disputing Party's request notice, or if the Parties failed to meet within thirty (30) days of such request notice, then each Party agrees that such controversy, claim or dispute shall be finally and completely settled without appeal by arbitration in New York, New York under the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") in effect as of the date of the request for arbitration, which rules are deemed to be incorporated into this Section 22(b); provided, however, that in the event of any conflict between such rules and the other provisions of this Amended Agreement, such other provisions of this Amended Agreement shall control. The arbitration shall be conducted before a panel of three (3) arbitrators. Each Party shall appoint one (1) arbitrator within thirty (30) days of receiving notice of the request for arbitration in accordance with the Commercial Arbitration Rules of the AAA. The two Party-appointed arbitrators shall then attempt to appoint a third arbitrator who shall act as the chairman of the panel (the "Chairman") within twenty (20) days of the appointment of the second arbitrator. If the Party-appointed arbitrators fail to agree on the Chairman within such period, the Chairman shall be appointed by the AAA upon the written request of any Party. Each Party shall be entitled to reasonable discovery rights, and issues as to discovery shall be determined by the arbitral panel applying the laws of the State of New York as provided in Section 21. The decision of the arbitrators shall be by majority vote, shall be in writing, shall set forth the facts found by the arbitrators to exist, their decision and the basis for that decision and shall be final and binding upon the Parties and not subject to appeal, and the judgment of any court of competent jurisdiction may be entered thereon. Except to the extent permitted by the express terms of this Amended Agreement, the arbitral panel shall not have the authority to award any consequential, punitive, special, exemplary or incidental damages. The arbitrators shall award the costs and expenses of the arbitration, including reasonable attorneys' fees, disbursements, arbitration expense, arbitrators' fees and the administrative fee of the AAA, to the prevailing Party as shall be determined by the arbitrators.

13

(c)     Each Party shall have an unconditional and absolute obligation to continue to perform its obligations under this Amended Agreement during the pendency of efforts to resolve any such dispute, unless and until such obligations are terminated by this Amended Agreement or prohibited by order of the arbitrators or a court of competent jurisdiction.

23.     Waiver of Jury Trial. EACH PARTY HERETO HEREBY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH OR ARISING OUT OF THIS AMENDED AGREEMENT, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF.

24.     Interpretation; Schedules. The headings contained in this Amended Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Amended Agreement. Whenever the words "include", "includes" or "including" are used in this Amended Agreement, they shall be deemed to be followed by the words "without limitation". The word "or" shall not be deemed exclusive unless the context requires otherwise. The words "hereof", "herein", "hereby" and "hereunder" and words of similar import when used in this Amended Agreement shall refer to this Amended Agreement as a whole and not to any particular provision of this Amended Agreement. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if". The definitions contained in this Amended Agreement are applicable to the singular as well as the plural forms of such terms. All Schedules attached hereto are hereby incorporated in and made a part of this Amended Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein, shall have the meaning as defined in this Amended Agreement. When a reference is made in this Amended Agreement to a Section or Schedule, such reference shall be to a Section of, or a Schedule to, this Amended Agreement unless otherwise indicated.

25.     Amendments and Waivers. This Amended Agreement may not be amended, modified, superseded or cancelled prior to the Effective Date except by an instrument in writing signed on behalf of each of the Parties hereto. From and after the Effective Date, this Amended Agreement may not be amended, modified, superseded or cancelled except by an instrument in writing signed on behalf of the Purchasers and the Supplier. By an instrument in writing a Party may waive compliance by the other Party with any term or provision of this Amended Agreement intended for the benefit of the waiving Party that such other Party was or is obligated to comply with or perform. No delay or omission by any Party to exercise any right or power under this Amended Agreement or pursuant to applicable law shall impair such right or power or be construed as a waiver thereof. A waiver by a Party of any of the covenants to be performed by the other Party or any breach shall not be construed to be a waiver of any succeeding breach or of any other covenant. The failure by any Party to enforce any term of this Amended Agreement shall not be deemed to be a waiver of future enforcement of that or any other term of this Amended Agreement.

26.     Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Amended Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, sent by telecopy (with hard copy to follow) or sent by reputable overnight express courier (charges prepaid), or (b) three (3) days following mailing by certified or registered mail, postage prepaid and return receipt requested. Unless another address is specified in writing, notices, demands and communications to the Supplier and the Purchasers shall be sent to the addresses indicated below:

(i)     if to Purchasers,

Mark IV Industries, Inc.
501 John James Audubon Parkway
Amherst, New York 14228
Attention: Mr. Mark G. Barberio
Telecopy: (716) 689-6098

And

Mark IV Industries, Inc.
6120 S. Yale Avenue
Suite 900
Tulsa, OK 74136-4236
Attention: Mr. Dennis Welvaert
Telecopy: (918) 481 -2388

with a copy to (which shall not constitute notice to Purchasers):

Skadden, Arps, Slate, Meagher & Flom, LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Attn:   Stephen D. Williamson
        J. Eric Ivester
Telecopy: (312) 407-0411; and

(ii)    if to Debtor,

Fluid Routing Solutions, Inc.
1935 Enterprise Drive
Rochester Hills, MI  48309
Attn:   John C. Carson
Telecopy: (248) 299-1490

with a copy to (which shall not constitute notice to Recipient):

15

Morgan, Lewis & Bockius LLP
One Oxford Centre, 32nd Floor
301 Grant Street
Pittsburgh, PA 15219
Attn: David A. Gerson
Telecopy: (412) 560-7001

(iii)     if to Supplier,

FRS Holding Corp.
5200 Town Center Circle, Suite 600
Boca Raton, Florida 33486
Attn: Jason H. Neimark, David Blechman and C. Deryl Couch
Telecopy: (561) 394-0540

with a copy to (which shall not constitute notice to Supplier):

Kirkland & Ellis LLP
200 East Randolph
Chicago, IL 60601
Attn: Jeffrey A. Fine, Esq.
Telecopy: (312) 861-2200

27.     Assignment.

(a)     This Amended Agreement and the rights and obligations of the Parties hereunder shall not be assignable by any Party without the prior written consent of the other Part(ies) hereto, except that: (i) the Purchasers may assign their rights and obligations under this Amended Agreement, in whole but not in part, without the prior written consent of the Supplier to a bona fide third party acquirer who would have aggregate gross revenues, calculated on a pro forma basis to reflect the acquisition from the Purchasers, of $500 million or more; provided, the Purchasers' right under this Section 27(a)(i) is limited in that the Purchasers may not, without the prior written consent of the Supplier, assign their rights or obligations under this Amended Agreement, in whole or in part, to any Person in direct competition with the Supplier's business, as such business is constituted on the date hereof; and (ii) the Supplier may, without the prior written consent of the Purchasers, assign its rights and obligations under this Amended Agreement, in whole but not in part, to: (A) one or more of its affiliates[1]; (B) any entity that acquires all or substantially all of the assets to which this Amended Agreement relates; and/or (C) a lender for purposes of collateral security; provided, in the cases of (A) and (B), any such assignee must agree in writing to be bound by the terms and conditions of this Amended Agreement. For the avoidance of doubt, and to the extent the Purchasers may assign their rights and obligations under this Amended Agreement, the Supplier acknowledges that the Purchasers

---

[1]     Note: Purchaser will assign the Proposed Purchase Agreement to a subsidiary prior to Closing, which subsidiary will be the operating entity operating under this Amended Agreement.

shall be entitled to assign all of their collective rights and obligations hereunder to a single assignee. Subject to the first sentence of this <u>Section 27</u>, this Amended Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns. Any attempted assignment in violation of this <u>Section 27</u> shall be void.

(b)     If an assignee of the Purchasers would have, calculated on a pro forma basis to reflect the acquisition from Purchasers, less than (i) $100 million in aggregate net sales, (ii) 2.5x EBITDA/interest, or (iii) $10 million in minimum tangible net book value, then the credit terms of this Amended Agreement (as identified in <u>Section 7</u>) shall automatically, without any further action or documentation required by any Party, convert from net forty-five (45) days to cash in advance.

28.     <u>No Third Party Beneficiaries</u>. Except as provided in <u>Section 18</u>, this Amended Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the Parties hereto and such assigns, any legal or equitable rights hereunder.

29.     <u>Entire Agreement</u>. This Amended Agreement, and its Schedules and Exhibits, and any Purchase Order delivered in connection herewith or pursuant hereto sets forth the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representation or warranties, whether oral or written, by any officer, employee or representative of any Party hereto.

30.     <u>Severability</u>. If any provision of this Amended Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

31.     <u>Counterparts</u>. This Amended Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each Party and delivered to the other Parties.

32.     <u>Survival</u>. The provisions of Sections 6, 9, 10, 11, 13(c), 14, 15, 18 and 21-33 shall survive the expiration or earlier termination of this Amended Agreement for any reason whatsoever.

17

33.     Joint and Several Liability. The Purchasers shall be jointly and severally liable for all obligations imposed on any the Purchaser under this Amended Agreement and liabilities relating to this Amended Agreement.

34.     Order of Precedence. This Amended Agreement and the Settlement Agreement are intended to be interpreted complementary but independent of one another.     Any inconsistency, ambiguity or conflict between this Amended Agreement and the Settlement Agreement shall be resolved in the following order of precedence (with (i) having the highest priority): (i) the Settlement Agreement; and (ii) this Amended Agreement.

IN WITNESS WHEREOF, the Parties have duly executed this Amended Agreement as of the date first written above.

DEBTORS:

Fluid Routing Solutions, Inc.

By: John C. Carson
Its: Chief Financial Officer

RECIPIENT:

FRS Holding Corp.

By: Michael Laisure
Its: CEO & President

PROVIDERS:

Mark IV Industries, Inc.

By: Mark G. Barberio
Its: Chief Financial Officer

Dayco Products, LLC

By: Mark G. Barberio
Its: Chief Financial Officer

Exhibit 1
Electronic Data Interchange (EDI)

See attached.

## Exhibit 2
### Vendor Guidelines

See Supplier Guidelines and Packaging Guidelines attached.

Exhibit 3
Traffic Guidelines

See attached.

**Schedule A**
List of Parts

See attached.

## Schedule B
### Pricing for Parts

See attached.

Escrow Termination Agreement

19

## RELEASE AND TERMINATION OF ESCROW AGREEMENT

This Release and Termination of Escrow Agreement (the "Agreement"), dated as of March 23, 2009 by and among Mark IV Industries, Inc., a Delaware corporation ("Mark IV"),and Fluid Routing Solutions, Inc., ("FRS Inc."), a debtor and debtor-in-possession in chapter 11 cases (the "Chapter 11 Cases") currently pending in the United States Bankruptcy Court for the District of Delaware under Case No. 09-10384 (CSS) (Jointly Administered), and Wells Fargo Bank, National Association, a national banking association (the "Escrow Holder," and collectively with the Mark IV and the FRS Inc., the "Parties"). This Agreement shall become effective only upon the occurrence of the Effective Date defined in that certain Settlement Agreement and Release, dated March [   ], 2009, among FRS Inc., certain of its debtor affiliates in the Chapter 11 Cases, Mark IV and its affiliate, and FRS Holding Corp., a Delaware corporation ("FRS Holding"), the proposed purchaser of certain of the Debtor's assets and business operations. (the "Settlement Agreement"). Each of Mark IV, FRS Inc. and the Escrow Holder is hereinafter referred to individually as a "Party" and together as the "Parties."

## RECITALS

WHEREAS, Mark IV, FRS Inc. and the Escrow Holder are parties to that certain Escrow Agreement, dated as of May 25, 2007 (the "Escrow Agreement"), pursuant to which Mark IV delivered $1,000,000.00 in cash (such amount, together with all interest and other income earned thereon, the "Escrow Funds") to the Escrow Holder to be held by the Escrow Holder in an escrow account pursuant to the terms of the Escrow Agreement;

WHEREAS, the balance of the Escrow Funds as of December 31, 2008 was approximately $1,043,181;

WHEREAS, Section 9 of the Escrow Agreement provides that the Escrow Agreement may be terminated at any time upon the mutual written consent of FRS Inc., Mark IV and the Escrow Holder; and

WHEREAS, pursuant to and in connection with the Settlement Agreement, the Parties desire to immediately terminate the Escrow Agreement and distribute the Escrow Funds as set forth herein;

NOW THEREFORE, in consideration of the premises set forth above and by execution of this Agreement, the Parties agree as follows:

1.  Defined Terms. Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Escrow Agreement.

2. Termination of Escrow. The Escrow Agreement is hereby terminated, effective as of the Effective Date, in accordance with section 9 of the Escrow Agreement.

3. Distribution of Escrow Funds. On the Effective Date, the Escrowed Funds shall be released by the Escrow Holder and shall immediately be distributed by the Escrow Holder as follows (a) $[____] shall be paid to the Escrow Holder, in full satisfaction of any and all fees owed to the Escrow Holder under the Escrow Agreement, and (b) the remaining balance of the Escrow Funds thereafter shall be paid to Mark IV.

4. Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, as appropriate, federal bankruptcy law and the laws of the State of New York, without regard to conflicts of law principles.

5. Representations And Warranties. The Parties acknowledge that they are executing this Agreement without reliance on any representations, warranties, or commitments other than those representations, warranties, and commitments expressly set forth in this Agreement.

6. Entire Understanding. This Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof. This Agreement may not be modified, altered, or amended except by an agreement in writing signed by the Parties.

7. No Party Deemed Drafter. This Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by the Parties and their counsel. Therefore, any ambiguous language in this Agreement shall not be construed against any particular party as the drafter of such language.

8. Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.

9. Notice. Each of the parties hereto acknowledges and agrees that the notice requirements under section 14 of the Escrow Agreement have been satisfied or waived.

IN WITNESS WHEREOF, the Mark IV, FRS Inc. and the Escrow Holder have duly executed this Agreement as of the date first written above.

FLUID ROUTING SOLUTIONS, INC.

_____
By:  John C. Carson
Its:  Chief Financial Officer

MARK IV INDUSTRIES, INC.

_____
By:  Mark G. Barberio
Its:  Chief Financial Officer

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Escrow Holder

_____
By:
Its: